**William PERRY, (Plaintiff-Respondent)**

v.

**CITY OF ST. LOUIS, a Municipal Corporation, and Malcolm Wittels, (Defendants-Appellants).**

Nos. 30616, 30617.

St. Louis Court of Appeals.

Missouri.

March 21, 1961.

**2.** Now V.A.M.R. Civil Rule 89.09.

**3.** Now V.A.M.R. Civil Rule 99.14.

Thomas J. Neenan, City Counselor and John J. Horgan, Associate City Counselor, St. Louis, for City of St. Louis.

Warren Grauel, Whalen, O'Connor & Grauel, St. Louis, for Malcolm Wittels.

James R. Anderson, and Anderson & Edwards, Clayton, for respondent.

ANDERSON, Presiding Judge.

This is an action by William Perry, as plaintiff, against the City of St. Louis and Malcolm Wittels, as defendants, to recover damages for personal injuries alleged to have been sustained as a result of a fall on the public sidewalk abutting premises owned by defendant Wittels. There was a verdict for $5,000 in favor of plaintiff, which was reduced by remittitur to the sum of $3,000. From the judgment entered on said verdict the defendants have appealed.

The alleged accident occurred on March 12, 1959, at about 7:30 p. m., on the south side of Chouteau Avenue in front of a building owned by Wittels, and numbered 2834 Chouteau. Plaintiff, at the time, was walking west on the sidewalk. Adjacent to the building was a board covering over a coal shute opening in the sidewalk. The record does not show the dimensions of this cover, but from the photographs in evidence it appears that it was several feet square. It was made up of several 2 inch boards running lengthwise with the sidewalk and was enclosed on all sides by an iron rim. The cover rested on beams spaced about two feet apart and stood several inches above the sidewalk.

The case was pleaded and submitted upon the theory that the boards covering the opening were weak, rotten and defective and, therefore, not reasonably safe to walk upon, which condition defendants failed to remedy after they knew, or should have known, of its existence.

Defendant Wittels makes two assignments of error, namely, (1) that the court erred in refusing to sustain his motion for a directed verdict on the theory there was no substantial evidence that the cover in question was unsafe by reason of decay, and (2) the court erred in submitting the issue of permanent injury for the reason there was no probative evidence upon which to submit such issue. Defendant City of St. Louis complains of the refusal to give "Instruction E" offered by it, which instruction was an affirmative submission of its theory of defense.

Plaintiff testified that on the occasion in question he stepped onto this wooden covering, and when he put his full weight on it, the covering broke and his leg went down into the opening all the way to his hip. In the process, the left side of plaintiff's body and head struck the side of the building. He was helped out of the hole by a passerby and later taken to his home.. He estimated the size of the hole as "about a four-inch hole, something like that, just enough for my whole leg to go through, * * *." From a photograph in evidence, which plaintiff identified as fairly representing the condition of the cover after his fall, it appears that the end of one of the boards making up the cover is broken off, making a hole the width of the board and extending several inches from the iron rim surrounding the cover toward the center of the cover.

As heretofore stated, defendant Wittels contends there was no substantial evidence that the covering was unsafe by reason of decay. On this issue plaintiff offered the testimony of John C. Stevens, a consulting engineer. Mr. Stevens examined the cover on March 25, 1959, at the request of plaintiff's attorney. Mr. Stevens took samples of the wood adjacent to the hole. These samples were introduced into evidence. They show evidence of decay. Mr. Stevens also testified that some of the boards of the cover showed evidence of rotting, and because of this condition had become abraded by traffic. He gave the following testimony:

"Q. Were these boards that you examined there, and directing your attention to the one that was broken, can you give the Jury any, your opinion, as to whether or not the board * * * was or was not in a weakened condition? A. Well, it was in a weakened condition from the standpoint of rotting. This was borne out by the fact that these samples that I have here were picked up by hand without any instrument to pick them up. In this photograph at the far end, the remnant of the board that filled this gap, is in just a series of slivers.

"Q. Now, you are referring to the part of the broken place that is near the iron rim or metal rim that surrounds this cover? A. Yes, sir. * * * at the near end of the same board, which would be again at the iron rim, there is a rough place in the board, which was evidence of decay at that position. * * * it was a surface condition.

"Q. Now, are there any surface conditions in those boards that would indicate to an engineer or a person trained as you are, whether or not any of that lumber had become rotted or decayed? A. The evidence that it is in the process of rotting is there. The extent is not sufficiently evidenced. That would be determined by either cutting samples or break into it." The witness then identified from a photograph in evidence, an area on the far end of the broken board, which gave surface evidence of rotting and decay, and stated that it was a condition which arose from the lumber being in a general state of decay. From the photograph and from Mr. Stevens' testimony it appears that the

visual evidence was a depression in the board caused by traffic over the area. The witness then testified, "Carrying on from there, the next question would be how badly decayed is that location, which, my first consideration was to try it with my fingers to see whether or not I could break out some of these pieces of wood. Then, * * * many times in rotted lumber, the shell might be weather beaten, be apparently intact, but the interior portion of the lumber will be completely, well, essentially destroyed, would have no strength. I took a slim-bladed knife and probed several places in this lumber to determine whether or not a shell can be, existed with no interior damage. The lumber did not seem to be hollowed out, but it was soft, indicating the general decay." At another point in his testimony Mr. Stevens said that the lumber was so badly decayed he could not definitely tell whether it was yellow pine or fir.

▪ From the foregoing evidence, we hold there was substantial evidence from which a jury could reasonably find that the board upon which plaintiff stepped was decayed and unsafe and was caused to collapse under plaintiff's weight.

It is next urged by defendant Wittels that if it be decided that the covering was weakened by decay, then there is a total failure of proof that a reasonable inspection would have disclosed this condition. To this we cannot agree. There was testimony, to which we have heretofore referred, that there was visible evidence of decay on the surface of the board which broke, and also on one of the other boards making up this cover. Stevens, upon observing this condition, inserted a thin-bladed knife into the lumber at several places, and discovered that the interior of the boards was soft, which condition indicated general decay. A jury might reasonably find that, in the exercise of due care, defendants themselves should have observed this surface decay, and should have made a like inspection; and that such an inspection would have given them notice of the decayed and dangerous condition of the cover.

The final point urged by defendant Wittels is that the court erred in giving and reading to the jury Instruction No. 12, which was a measure-of-damage instruction. The specific complaint made is that the instruction was erroneous for the reason that it submitted the issue of permanent injury when there was no probative evidence upon which to base such submission.

Plaintiff sustained injuries to his face, neck and left side. On the day following the accident he was taken to Homer G. Phillips Hospital, where he remained until March 15th. During his stay at the hospital he was x-rayed, given "shots" and tablets to reduce pain. After he left the hospital he returned there for treatment on three different occasions. On June 17th, he consulted Dr. Vaughan C. Payne. Dr. Payne testified that plaintiff's complaints at that time were, painful and stiff left hip and shoulder region; also pain in the neck muscles. The doctor's examination made at that time revealed tenderness and spasticity over the left hip and left sacroiliac joint region. The left shoulder region was stiff with limitation of motion in all directions.

Plaintiff was able to raise his left arm for only a short distance. Plaintiff was given heat treatments by the doctor on fifteen occasions between June 17, 1959 and July 30, 1959. Treatments were directed to the shoulder, neck, hip and sacroiliac region. There was a slight improvement during the time he was under this treatment from June 17th to July 30th. Plaintiff was not discharged on the latter date, but was told to use heat treatments at home, and advised he could come back to the doctor's office if he continued to have trouble. Plaintiff never returned to the doctor's office. Dr. Payne testified that on July 30, 1959, plaintiff had some residual spasticity in the left hip region and in the left sacroiliac joint region. At that time plaintiff was unable to raise his left

arm above his left shoulder. Dr. Payne was asked on direct examination if he had an opinion as to whether the condition found on his last examination was of a permanent nature. He answered, "Well, it has been a good while since I examined him on the thirtieth of July, at which time he did have the process still there, but I had no chance to examine him since that time."

The foregoing answer was clarified somewhat by his subsequent testimony on cross-examination as follows:

"Q. * * * Not having had Mr. Perry under your professional care since July, since July 30, you are unable to say as of today, then, of course, whether or not he is or is not recovered, isn't that right? A. I said I wasn't able to make a fair prediction as to whether or not to what extent he had not recovered because I know how he was when I saw him, and so far as I know—

"Q. He could or could not be? A. As I said, I couldn't say.

"Q. In other words, the most that you can testify to is as to what you found on the occasion of your last visit with Mr. Perry on July 30, isn't that right? A. That is right.

"Q. Your observations of Mr. Perry and your professional appraisal must stop as of July 30, the last time you saw him, isn't that correct? A. Well, it would have to stop at that because I had not observed him long enough."

On re-direct examination Dr. Payne gave the following testimony:

"Q. * * * do you have an opinion as to whether or not he had any tearing of the muscles in this instance? A. Yes, I do.

"Q. And what is your opinion? A. My opinion is that he did suffer tearing of the muscles in this particular accident.

"Q. Alright. * * * as I understand, you were telling Mr. Grauel when this

tearing heals, it forms a scar, does it not? A. Yes.

"Q. Did that occur in this particular patient? A. * * * it would be my opinion that it did, by my examination.

"Q. Alright. Now, what is the affect, if any, of this scarring on the muscles in this particular patient, Mr. Perry? A. The affect of scarring on the muscles on this particular patient is that you get a loss of elasticity of the muscles. Normal elasticity. Normal muscles stretch like a rubber band, but when you get scar tissue, it does not stretch and that is when we have the limitation of motion as a result of it.

"Q. Is that the limitation of motion that you have described here in Mr. Perry? A. Yes, sir.

*     *     *     *     *     *

"Q. Now, once that scarring occurs, as you have described here, will that scarring ever completely disappear on the muscles? A. No.

"Q. Is that a permanent situation? A. Yes.

"Q. And what about the affect of it, is that a permanent situation? A. Yes, sir."

Defendant Wittels seeks to invoke the rule set forth in Adelsberger v. Sheehy, 332 Mo. 954, 59 S.W.2d 644, that where a party relies on the testimony of a single witness to prove a given issue, and the testimony of the witness is contradictory and conflicting, one version tending to prove the issue, and the other tending to disprove it, with no explanation of the contradiction and no other circumstances tending to show which version is true, the jury should not be permitted to speculate or guess which statement of the witness should be accepted.

Said defendant in urging the application of this rule contends that since Dr. Payne indicated on direct and cross-examination that he was unable to testify with respect

to the permanency of any injury sustained, his testimony on re-direct examination that, in his opinion, plaintiff suffered a tearing of the muscles that accounted for the loss of motion in his arm should not be considered, and for that reason the court erred in giving Instruction No. 12 which submitted the issue of permanent injury.

In our judgment there is no merit to this contention. On direct examination the doctor stated that when he examined plaintiff on July 30, 1959, plaintiff had some residual spasticity in the left hip region, and in the area of the sacroiliac joint. He also testified that plaintiff was unable to lift his left arm above his left shoulder. When asked if any of the conditions he found were of a permanent nature, he made no direct answer, but merely stated he had had no chance to examine plaintiff since July 30, 1959, and on cross-examination, in effect, stated that by his answer he meant he was then unable to say to what extent the healing process had progressed. At least a jury could so construe said testimony. Up to that point the doctor had expressed no opinion as to the permanency of any of the conditions he found plaintiff suffering from on July 30, 1959. Thereafter he did express his opinion that there was a tearing of the muscles which left scar tissue, which would result in a permanent loss of motion in plaintiff's arm. We are of the opinion that Dr. Payne's testimony was not so conflicting or contradictory as to have no substantial probative effect; and we hold that the court did not err in giving Instruction No. 12.

Defendant City of St. Louis complains of the refusal of the court to give and read to the jury Instruction E, which was offered by said defendant. This instruction submitted the defense of contributory negligence based upon the hypothesized facts that plaintiff fell through a hole in the wooden cover which was present in said cover, at and prior to plaintiff's fall, which hole was plainly observable and should

have, in the exercise of ordinary care, been avoided by plaintiff.

Plaintiff's answer to this complaint is that the Instruction was not within the pleadings and not supported by the evidence. There is no merit to either proposition. There was a general plea of contributory negligence, which was not attacked, and which was, therefore, sufficient to permit proof of the facts hypothesized. Richard O. Moore testified that he was employed by the City of St. Louis as a photographer; that on March 12, 1959, about 2:30 p. m., pursuant to a request from the legal department of the City, he took a photograph of the wooden cover over the coal hole in the sidewalk in front of 2834 Chouteau Avenue; that the reason for taking the photograph was, that a claim had been made by one Charles Hester against the City by reason of falling there on February 26, 1959; that the photograph which he identified as defendant City's Exhibit "A" represented the condition he saw and photographed on March 12, 1959, and accurately portrayed what existed there at the time, and that it showed part of one of the planks completely broken out leaving a hole. An examination of this Exhibit reveals that it is the same hole as shown on plaintiff's Exhibit "2", which was a photograph taken subsequent to March 12, 1959, and which plaintiff testified was a true representation of the condition of the cover after his fall.

Plaintiff testified that at the time of his accident he could see ahead as he walked west on Chouteau, and that there was no person or anything between him and the place where he fell that would have prevented him from seeing the wooden cover as he walked toward it. Plaintiff testified that his left leg went through the cover all the way to his hip. In our judgment the foregoing evidence was sufficient to support the proposed instruction, and the court erred in refusing to give same. Defendant City of St. Louis was entitled to an affirmative submission of

its own theory of the facts and the law under those facts. Wilson v. Miss Hulling's Cafeterias, Inc., 360 Mo. 559, 229 S.W. 2d 556. Said defendant is entitled to a new trial on the issue of liability.

The judgment is reversed and the cause is remanded with directions to the trial court to hold in abeyance the verdict as to both liability and amount of damages against defendant Malcolm Wittels, until the case is disposed of as to the liability of defendant City of St. Louis, either by trial or otherwise, and then to enter judgment for the amount of the verdict held in abeyance against the defendant or defendants, held liable.

RUDDY and WOLFE, JJ., concur.