**Raymond W. CLINE, Respondent,**

**v.**

**CARTHAGE CRUSHED LIMESTONE COMPANY, Appellant.**

No. 57290.

Supreme Court of Missouri, Division No. 2.

Dec. 10, 1973.

*Motion for Rehearing or to Transfer to Court en Banc Denied Jan. 14, 1974.*

Plaintiff and several regular employees of CCL, assigned to the job to help plaintiff, installed a new 800-pound shaft and bearings in a hammer mill. While testing to see if the shaft and bearings were properly installed and running cool plaintiff reached over to bring his hand down to feel of a bearing, at which time he was struck by a rapidly revolving 40-inch wrench which had been attached to the shaft by one of the regular employees of CCL while the shaft was stationary, and which the employee forgot to remove before the machinery was started up. Plaintiff was unaware that the wrench had been attached to the shaft. The wrench, revolving at 1800 r.p.m. or 213.6 m.p.h., was invisible.

### I. Employee or Independent Contractor?

CCL's principal point on appeal is that plaintiff's sole and exclusive remedy is under the Workmen's Compensation Law, Chapter 287, RSMo 1959, V.A.M.S., because plaintiff was a regular employee of CCL; but if he was an independent contractor and not a regular employee he was a statutory employee of CCL under § 287.-040(1), RSMo 1959, V.A.M.S., because he was injured while working about the premises of CCL, doing work alleged to be in the usual course of the business of CCL. Plaintiff claims that he was neither a regular nor a statutory employee at the time and therefore he may maintain this common law action for negligence.

Whether at the time of his injury plaintiff was an employee of CCL was submitted to the jury under Instruction No. 8 and whether plaintiff, as an independent contractor working about the premises of CCL, was injured while doing work which was an operation of the usual business there carried on by CCL was submitted by Instruction No. 6. These issues were decided adversely to CCL.

This Court has previously applied the tests laid down in the Restatement of

Henry G. Eager, John J. Kitchin, Kansas City, Donald W. Kennedy, Nevada, for respondent; Swanson, Midgley, Eager, Gangwere & Thurlo, Kansas City, of counsel.

Karl W. Blanchard, Herbert Van Fleet, Joplin, for appellant; Blanchard, Van Fleet, Robertson & Dermott, Joplin, of counsel.

HOUSER, Commissioner.

Raymond W. Cline sued Carthage Crushed Limestone Company, a Corporation, for $250,000 damages for personal injuries sustained as a result of the negligence of CCL while plaintiff was doing mechanical work on a limestone pulverizing machine in CCL's plant in Jasper County. Following a jury verdict of $150,000 CCL appealed to this Court on September 3, 1971.

Agency 2d, § 220, p. 485, in determining whether a questioned relationship is that of master and servant or employer and independent contractor. Dean v. Young, 396 S.W.2d 549, 553 (Mo.1965); Barnes v. Real Silk Hosiery Mills, 341 Mo. 563, 108 S.W.2d 58, 61[3–5] (1937). We accept those standards in deciding this appeal, and give a brief rescript of the evidence relating to each statement of the Restatement criteria:

"(1) A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.

"(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:

"(a) the extent of control which, by the agreement, the master may exercise over the details of the work; * * *."

According to plaintiff, when CCL wanted something made or installed the general manager and plant engineer, Mr. Workizer, would prepare a blueprint, draw a sketch, or lay it out and describe generally what was wanted, and plaintiff would "build it from there." Sometimes plaintiff designed and "figured it out himself." "[H]ow to weld it and put it together, that's mine." There was nobody with plaintiff during the performance of the work telling him how to do it; he did it "on his own." Plaintiff stated, "I was an independent, I was on my own, individual." On the hammer mill job plaintiff was in charge and personally responsible; it was up to him to get the hammer mill back in operation; no one was giving instructions about this installation other than plaintiff. Mr. Russow, CCL's general superintendent, was not in charge of plaintiff on this installation, although Russow was present from time to time during the installation. Employees Bryant and Maggard were working under Russow and the latter was

their "boss." It was plaintiff, not Russow, who adjusted and "okayed" the bearings. On this job plaintiff took the lead and controlled the operation. Plaintiff testified, "That was my baby to see that them bearings were put in and adjusted. * * * This installation was up to me to see that was done right."

On the other hand, Mr. Workizer testified that he ordinarily directed the details of plaintiff's work; that while plaintiff was "not the kind that needed constant supervision," nevertheless "one working for you needs some supervision." Mr. Workizer conceded that while he would not turn an installation over to plaintiff "lock, stock and barrel" he did not tell Cline how to build the chutes, ductwork, etc., "didn't tell him to go into detail on a lot of things."

"(b) [W]hether or not the one employed is engaged in a distinct occupation or business; * * *."

In 1943 plaintiff, having acquired experience as a welder in the employment of others, went into business for himself in Carthage. In 1945 he had a 30 x 30 foot shop building built. He called the business "Cline's Welding." He is the owner. His wife keeps the books. It has been his sole livelihood since he opened the business. He kept supplies of steel at his shop and in a 24 x 24 foot shed built east of the shop. He equipped his shop with the tools of his trade, including a forge, anvil, hand tools, lathe, drill press, pullers and bearing knockers, pipe dies, tap and die sets, socket sets, set of crescent wrenches, numerous box and end wrenches, hammers, chisels, Skilsaw, various sized electric drills, portable hand grinders, several chains of different sizes and lengths, snatch blocks and boomers, acetylene torches and gauges, a 250 amp. stationary welder, electric hoist, hydraulic jacks, floor jacks, ratchet hoist, rope falls, puller jacks, a Chevrolet pickup truck, and a 2-ton Chevrolet truck with crane, boom and winch, with 300 amp. gas-driven portable welder. Since 1945 he has been listed in

the Carthage telephone book as "Cline's Welding," both in the black and white listings and in the yellow classified section. He kept records of jobs. His wife made statements and tax returns from the books. Billings were made by statements sent out the first of the month. Plaintiff's letterhead bore the words "Cline's Welding." His records show that during the nine years preceding trial Cline's Welding did work for 114 different companies or individuals other than CCL and its affiliate Carthage Marble Company, including one order from the state highway department for 300 snow plows. Plaintiff's work at CCL consisted of welding, repairing, making and building different pieces of equipment.

"(c) [T]he kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; * * *."

While this was the first time the hammer mill (new in 1965) broke down and there had been no previous occasion to replace the shaft and adjust the bearings, this type of work in the past had been done by regular employees of CCL on the old and smaller hammer mill. On this occasion the work was done at the instance but not under the direction of the employer. It was done under the direction of plaintiff without supervision by, albeit with the assistance of, regular employees of CCL. Gene Patrick, a welder employed by CCL, was primarily concerned with repairing and maintaining CCL equipment, including building up hammers in the hammer mill. Plaintiff taught Patrick how to do this. Other work of this nature around the plant was customarily done by Patrick under the direction of his superiors, but this type of work was often done by plaintiff, a specialist, without supervision.

"(d) [T]he skill required in the particular occupation; * * *."

Plaintiff customarily performed a number of tasks for CCL which plainly required considerable skill and training, such as building up hammers, making repairs on a variety of installations, working on the fork lift trucks, conveyor, dust collector, separator and the new building, and working on the vibrator table, loader, the "Euclids" and the drill truck at Marble. Mr. Workizer testified that plaintiff was more than an ordinary welder; that he did more than "just welding pieces of steel together"; that he used his mechanical know-how; that he was "a very responsible individual" upon whom "you could rely to do a decent job, an excellent job," and that Mr. Workizer "had particular confidence in his capabilities." Installing a new shaft in the hammer mill and adjusting the bearings is a job "in which you have to know what you are doing" or the bearings will burn up.

"(e) [W]hether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; * * *."

Plaintiff supplied his own instrumentalities and tools. He seldom used CCL equipment, and on the few occasions when he used CCL's gasoline for his welder he paid CCL for it. On the day in question plaintiff used his own 20-ton jacks to lift and reset the motor; used his winch truck to lift the 800-pound shaft, and personally constructed a special gauge to set the bearings properly. Plaintiff supplied the jacks and the winch truck, without which the job could not have been accomplished. The general superintendent testified that CCL did not have the equipment to lift the shaft and the "stuff to do it with." Plaintiff's work for CCL, Marble and its predecessor has been done both at his own shop and on the employers' premises.

"(f) [T]he length of time for which the person is employed; * * *."

Mr. Workizer testified that he never explicitly told plaintiff to come to work at 7 o'clock and work until 3:30 (as regular employees of CCL were obliged to do) but his understanding was that plaintiff would

be at work at 7 o'clock and "work whatever hours were necessary." Plaintiff never punched a time clock, as did the other employees. Plaintiff testified that he generally tried to put in a day's work; that at different times he had stayed until 9 or 10 o'clock at night; that if it was necessary to work after hours to get a piece of equipment in operation he would stay an hour or two hours extra and fix it.

Plaintiff's employment with Marble began in August, 1961, when he worked on some hoppers. That work continued until December 26 of that year. Plaintiff continued working for Marble in 1962, 1963 and 1964, performing a variety of tasks on different items of equipment and machinery. In 1964 Marble purchased CCL and in 1965 work was started on a new plant at CCL. When the new plant was started plaintiff began working at CCL and continued working there until date of injury, April 20, 1968. During this time plaintiff occasionally worked at Marble, and for others. The percentages of time plaintiff spent performing services for Marble and CCL follow: 1960–6%; 1961–25%; 1962–43%; 1963–27%; 1964–75%; 1965–75%; 1966–90%; 1967–92%; 1968–90%.

"(g) [T]he method of payment, whether by the time or by the job; * * *."

When plaintiff first worked for Marble in 1961 he said he would not contract the job on the hoppers but would do it at an hourly rate of $4.50 for himself and his equipment, which included the use of his truck, winch, jacks, welder, gas, tools, welding rod, falls, sling for high work, etc. This was the only agreement plaintiff ever had with Marble or CCL with respect to method of payment. Plaintiff kept account of the hours worked and at the end of the month billed CCL for the total, for which he received monthly checks. Gene Patrick, the welder in the regular employ of CCL, received $2 an hour wages. Although plaintiff often worked overtime he was never paid overtime. CCL employees were paid overtime. Plaintiff was not carried on CCL's payroll. The general manager authorized the office to pay plaintiff on creditor vouchers, the same as those used to pay for any merchandise or services purchased, out of a different account from employees' payroll. CCL bookkeeping and financial records showed plaintiff to be "an independent creditor." CCL paid plaintiff by green checks similar to those issued all other creditors. Plaintiff was never paid from the payroll account, from which employees were paid weekly by yellow checks figured upon time cards. Plaintiff had no time cards.

"(h) [W]hether or not the work is a part of the regular business of the employer; * * *."

In considering this factor in determining whether there was sufficient evidence to submit to the jury the question whether plaintiff was a regular employee we consider the evidence on the closely related question whether as a matter of law CCL was a statutory employer of plaintiff under § 287.040(1), RSMo 1959,[1] V.A.M.S.

The regular business—the usual business—of CCL is the manufacture and sale of calcium for feeding poultry, for industrial glass plants and for use in cosmetics. The manufacturing process includes the storage, drying, pulverizing, screening, refining, separating and sacking of crushed rock. A continuous manufacturing operation of this kind involves occasional or recurring construction, installation, repair and maintenance of facilities and machinery. As indicated, this was the first time the shaft and bearings on this hammer mill had been replaced. CCL's regular maintenance man had never adjusted or changed the bearings on this hammer mill. There had never been any problem with this shaft or the bearings before this work was done.

1. "Any person who has work done under contract on or about his premises which is an operation of the usual business which he there carries on shall be deemed an employer and shall be liable under this chapter to such contractor, his subcontractors, and their employees, when injured or killed on or about the premises of the employer while doing work which is in the usual course of his business."

While regular employees of CCL could have done the work if CCL had had the necessary equipment to lift the heavy shaft (winch) and motor (20-ton jacks) and the necessary gauge, CCL did not have this equipment. Appellant points to evidence that Superintendent Russow had experience in the repair of hammer mills since 1949; that on the old hammer mill, replaced by the one in question, Russow had replaced the bearings four or five times a year, and Gene Patrick had replaced bearings and installed shafts on the old (and smaller) hammer mill; that bearings and shaft have to be replaced in hammer mills from time to time as an operation of the usual business there carried on by CCL; and urges and emphasizes that plaintiff had been working from 1964 at CCL on installation, repair and maintenance, devoting practically his entire time to this employment, which was a never ending process.

Paragraph 3 of § 287.040 [2] provides that that section does not apply to the owner of premises upon which improvements are being repaired by an independent contractor. On the question whether the hammer mill is an "improvement" within the meaning of par. 3 there was evidence that the hammer mill is an integral part of the manufacturing process; that it weighs two tons; that it is sunk in concrete upon two pillars a foot and a half thick and that the shaft itself weighs 700–800 pounds.

"(i) [W]hether or not the parties believe they are creating the relation of master and servant; * * *."

Social Security was never withheld from plaintiff's account or paid by CCL on him. His name was never included on any reports covering CCL employees. No federal or state income tax was withheld, reported or paid for plaintiff (as in the case of all CCL employees). On his income tax returns plaintiff showed income from "Cline's Welding." He paid his own federal self-employment tax. All CCL employees are required to join the union within 26 days after initial employment. Union dues are deducted from their wages. Plaintiff did not belong to the union. The bookkeeper did not deduct union dues from his checks. When the union complained that plaintiff was doing work which their members should be doing plaintiff suggested to Mr. Workizer that he become an employee, join the union, and rent or lease his equipment to CCL. The suggestion was rejected by Mr. Workizer who said he didn't think that would work; he did not want to do it. Unlike CCL employees, plaintiff was not covered by CCL's life and health insurance program, which was partially paid for by CCL. All employees were given a paid vacation but not plaintiff. Plaintiff determined when to take a vacation, and ordinarily did so when the work was slack. Money paid plaintiff was never listed on monthly workmen's compensation payroll reports sent to CCL's insurance company (on which premium payments were calculated). CCL's office manager did not send a report of injury to the workmen's compensation commission after plaintiff's injury occurred. According to the office manager plaintiff "was never considered an employee."

On the question whether CCL had the right, without incurring liability, to terminate the relationship at will before completion of the work in progress the record is unclear, indeed ambiguous. Plaintiff conceded that Mr. Workizer had the right to tell him not to work, but it is not clear whether he was referring to temporary cessation of employment for a few days or weeks, or final termination of the relationship. Mr. Workizer testified, in answer to the question "Who had the ultimate say on the termination of Mr. Cline?," that if there had been some dissatisfaction it prob-

---

2. "The provisions of this section shall not apply to the owner of premises upon which improvements are being erected, demolished, altered or repaired by an independent contractor but such independent contractor shall be deemed to be the employer of the employees of his subcontractors and their subcontractors when employed on or about the premises where the principal contractor is doing work."

ably would have been him (Workizer), and Workizer would have consulted with his superiors before arriving at a decision, but where the work was *completed* he "would have consulted no one."

■ Appellant contends that whether plaintiff was an employee of CCL or an independent contractor is a matter of law for the court to decide. This is true where the facts are undisputed, Nabors v. United Realty Co., 298 S.W.2d 474, 477[1] (Mo. App.1957); Lawson v. Lawson, 415 S.W. 2d 313, 316[3] (Mo.App.1967); Wallace v. Porter DeWitt Const. Co., 476 S.W.2d 129, 130[1] (Mo.App.1971), but here the fact question was contested. There was conflicting evidence on several vital points from which more than one inference as to the relationship of the parties could be drawn. In such case the drawing of the inference is properly left to the jury. Dean v. Young, supra. Likewise on the ultimate test (right of control) if the facts and legitimate inferences to be drawn from the evidence are in dispute (as they are in this case) the issue is one for the jury. Benham v. McCoy, 213 S.W.2d 914, 919 (Mo.1948).

There was sufficient evidence for the jury to find that CCL did not exercise or have the right to exercise control over plaintiff in the performance of the details of his work; that he was not an employee but was an independent contractor, engaged in a distinct business, who could come and go at will; that the work in question was delegated to plaintiff as a specialist without supervision; that it required skill and considerable ability; that

plaintiff supplied the instrumentalities for the performance of the specialized job in the performance of which he was injured; that the $4.50 paid plaintiff on an hourly basis was "not so much straight payment for the worker's own services on a time basis as a contract charge ultimately related to time," Larson, Workmen's Compensation Law, Vol. 1A, § 44.33(a), p. 664; that plaintiff was repairing an improvement upon premises owned by CCL, State ex rel. Long-Hall Laundry & Dry Cleaning Co. v. Bland, 354 Mo. 97, 188 S.W.2d 838 (banc 1945); that the work he was then and there doing was incidental, ancillary or auxiliary in nature and not a part of the regular and usual business carried on by CCL on the premises, Szofran v. Century Electric Co., 255 S.W.2d 443 (Mo.App.1953); Cummings v. Union Quarry & Const. Co., 231 Mo.App. 1224, 87 S.W.2d 1039 (1935); Wooten v. Youthcraft Mfg. Co., 312 S.W.2d 1 (Mo. 1958); State ex rel. Long-Hall Laundry & Dry Cleaning Co. v. Bland, supra; Eckmayer v. Newport, 267 S.W.2d 379 (Mo. App.1954); Larson, Workmen's Compensation Law, Vol. 1A, § 49.12, p. 866; that plaintiff's role was to facilitate the operation of CCL's business but not to work in or participate in the actual operation of the manufacturing business carried on by CCL on the premises, cf. Wallace v. Porter DeWitt Const. Co., supra, 476 S.W.2d l.c. 134; and that the parties did not believe that they were creating the relationship of master and servant.

## II. Propriety of Instructions.

Appellant attacks Instruction No. 3.[3] First, appellant complains that although

---

3. Instruction No. 3: "Your verdict must be for plaintiff if you believe:

"*First*, defendant left a wrench on the shaft of the hammer mill when it was turning and as a result the shaft was not reasonably safe for persons working on it, and

"*Second*, plaintiff did not know and by using ordinary care could not have known of this condition, and

"*Third*, defendant failed to use ordinary care to remove the wrench before the shaft began to turn, and

"*Fourth*, as a direct result of such failure, plaintiff was injured

"Unless you believe plaintiff is not entitled to recover by reason of Instruction Numbers 6, 8 or 10. The term 'ordinary care' as used in this instruction means that degree of care that an ordinarily careful and prudent person would use under the same or similar circumstances."

plaintiff alleged that defendant had knowledge that the wrench should not have remained upon the shaft of the machine, his verdict-directing Instruction No. 3, based on MAI 22.03, entirely omitted the third paragraph of that approved instruction, which reads: "Third, defendant knew or by using ordinary care could have known of this condition, * * *"; that knowledge that the wrench was attached to the machine was a necessary element vital to plaintiff's case but was omitted from the given instruction; that MAI 22.03 is applicable; that its use without modification was mandatory and it was not subject to modification.

■■ When knowledge of a condition and appreciation of the danger are essential controverted elements of a defense, Koirtyohann v. Washington Plumbing & Heating Co., 471 S.W.2d 217, 221[6] (Mo. 1971), or a cause of action, such issues must be submitted to the jury. Where, however, it is undisputed that the dangerous condition was caused and created by defendant's employees, a plaintiff's instruction directing a verdict need not contain a finding of knowledge and appreciation. In that circumstance it follows that defendant had knowledge. "And since the unsafe crossing was created by the defendant, it inevitably follows that knowledge of that condition was present. Having notice in fact that the crossing was not reasonably safe for ordinary use by automobiles, no sound reason appears why the instruction should have required the jury to find that defendant possessed such knowledge." Hartmann v. St. Louis-San Francisco Ry. Co., 280 S.W.2d 442, 446[4] (Mo.App. 1955). "If the offending article or substance is placed by a defendant or its agents or employees where it will harm others, the defendant then has actual or constructive notice of its being there. So the question of time and notice is no longer present." Eilers v. Union Electric Co., 386 S.W.2d 427, 431[7] (Mo.App.1964). "The unsafe condition of the ladder and the floor was caused by the acts of defend-

ant's employees. In such circumstances the question of notice, actual or constructive, was not in the case." Page v. City of Fayette, 233 Mo.App. 37, 116 S.W.2d 578, 582[12] (1938). The fact that CCL had that knowledge and appreciated the danger was an uncontradicted, uncontested fact. Not only was the fact not denied or disputed: it was testified to affirmatively by defendant's own employees. CCL's general superintendent Russow testified that he was satisfied that one of CCL's employees put the wrench on the hammer mill shaft; that it was dangerous and there was no intention to leave the wrench on the shaft, but that it was forgotten. CCL's regular employee Maggard testified that he put the wrench on the shaft; that he forgot it and did not take it off; that he knew the mill had started up but did not tell plaintiff the wrench was on the shaft. There was no countervailing or contradictory testimony on this point. Under these circumstances it was not necessary for Instruction No. 3 to submit a finding that CCL possessed this knowledge. "While knowledge by appellant's employees of plaintiff's presence was a necessary element of plaintiff's case, it was not necessary to submit this factor in Instruction No. 3 because this was not a controverted fact or contested issue." Stevens v. Missouri Pacific R. Co., 355 S.W. 2d 122, 131[22] (Mo.1962). "It is not reversible error for a court to assume the existence of an undisputed or contradicted fact and omit it from an instruction. Cases cited in West's Mo. Digest, Vol. 27, Trial, ■■■■ White v. Citizens Ins. Co. of New Jersey, 355 S.W.2d 421, 424[5] (Mo.App.1962). " * * * [T]here was no dispute as to these facts. * * * [T]he elements which appellant contends should have been hypothesized were in fact undisputed and therefore need not have been hypothesized." Kagan v. St. Louis Public Service Co., 360 S.W.2d 261, 268[6] (Mo.App.1962). "The defendant urges that this instruction improperly omitted to hypothesize the facts of the snow on the streets and the angle of the intersection. Since there was no dispute as to these

facts, it was not necessary to submit them." Hopkins v. St. Louis Public Service Co., 382 S.W.2d 442, 448[8] (Mo.App.1964). " * * * [W]here the essential facts are not really in dispute it is not necessary for a verdict directing instruction to affirmatively require the jury to find such facts." Landie v. Century Indemnity Co., 390 S.W.2d 558, 567[12] (Mo.App.1965). And see McMillan v. Bausch, 234 S.W. 835, 837[3] (Mo.1921).

These rules, announced in pre-MAI cases, apply as well to cases submitted under MAI. In the instructions on how to use the MAI book, bottom of page XXXI and top of page XXXII, MAI, hypothesization of facts about which there is no dispute is deplored and said not to be required. Drafters of instructions are advised to make certain that an element is really in issue before injecting it into an instruction. Instances are given illustrating the fact that counsel may further simplify a Missouri Approved Instruction "by deleting the element not in issue." There was no error in deleting paragraph third of MAI 22.03.

Next, appellant asserts that No. 3 erroneously "assumes agency" and "omits a finding of agency on the part of the persons whose acts of commission or omission plaintiff claimed made defendant vicariously liable." Appellant argues that the agency of Maggard for CCL was not conceded but was a live issue; that No. 3 should have been modified as provided in MAI 18.01 to require a finding that Maggard was acting within the scope and course of his employment by CCL when he attached the wrench and failed to remove it from the shaft. The transcript does not bear out appellant's contention that agency was a live issue. It is true that appellant's answer denied plaintiff's allegation that CCL employees negligently permitted a wrench to remain attached to the shaft, etc., but all of the testimony showed that regular employees of CCL committed the negligent acts of commission and omission which oc-

casioned plaintiff's injuries. CCL's regular employee Maggard, who as we have seen admitted that he attached and failed to detach the wrench and failed to notify plaintiff of its presence, testified that he was employed by CCL and that Russow was his boss. Russow, superintendent of CCL, testified that when regular employees of CCL were helping plaintiff when plaintiff needed assistance they were "still" Russow's employees. There was no testimony that Maggard, who was working with plaintiff at the time and place in question, was not CCL's employee, acting in the scope and course of his employment. The only intimation to the contrary pointed out by appellant is the following question and answer appearing in plaintiff's deposition: "Q Maggard and Bryant and Russow were working under your direction? A That's right." At the trial, however, plaintiff explained that in so answering he did not mean that he had the right to hire and fire or command these men, but merely that it was up to plaintiff to see that the work was done right and when they were helping him if he would ask one of them to "hold up a piece or put a bolt through" they would do it. On this record the agency of Maggard for CCL may fairly be taken as an undisputed fact. When agency is not a contested issue a verdict-directing instruction need not contain a requirement of a finding of agency. Terry v. Sweeney, 420 S.W.2d 368, 376[8] (Mo.App.1967); Friend v. Gem International, Inc., 476 S.W.2d 134, 139–140[17] (Mo.App.1971), holds that when the evidence with respect to a relationship or status (in that case the relationship of landlord and tenant) is not disputed a finding of the relationship in a verdict-directing instruction is not required. There was no requirement of a finding that Maggard was CCL's agent because the fact was undisputed.

In further criticism of No. 3 appellant contends that it is argumentative; that instead of par. First saying "First, defendant left a wrench on the shaft of the hammer mill when it was turning

* * *" the paragraph should have said "First, there was a wrench on the shaft of the hammer mill and as a result * * *." It is further argued that the wrench was not placed on the shaft "when it was turning" and that the words in par. Third " * * * before the shaft began to turn, and * * *" injected more argument. No. 3 properly submitted the element of a revolving shaft. The petition pleaded the negligent act of permitting a wrench to remain attached to a shaft *while in operation*. That was the evidence. That was the gist of plaintiff's case: a wrench negligently left on a shaft revolving at 1800 r. p. m., invisible and highly dangerous to one approaching the machine without knowledge of its presence. The words quoted from par. Third were properly used for the reason stated in plaintiff's brief: "because the wrench could not be physically removed once the hammer mill was running, and the shaft was turning the wrench at 213 miles per hour."

■ Appellant assails Instruction No. 7[4] as prejudicially erroneous because it purports to direct a verdict without containing all of the essential elements of a verdict director. By offering Instruction No. 6,[5] to which No. 7 refers, CCL was seeking to submit the defense that CCL was a statutory employer under § 287.040, par. 1, RSMo 1969, V.A.M.S.,[1] and therefore not subject to common law liability. By offering No. 7 plaintiff was seeking to incorporate in No. 6 the exception provided for in par. 3 of § 287.040,[2] under which plaintiff would not be restricted to relief under the workmen's compensation act if his injuries were sustained while improvements were being repaired on CCL's premises.

No. 7 did not constitute a general direction of a verdict for plaintiff, as appellant suggests. It was in effect a direction to find for plaintiff (and not for CCL) on the issue of statutory employer. No. 7 complemented and completed the submission under § 287.040 partially initiated by offering No. 6. CCL's No. 6 submitted the "operation of the usual business" basis for a finding of statutory employer-employee relationship. No. 7 supplied the exception not negatived by No. 6. A finding for plaintiff under No. 7 would negative CCL's defense of statutory employer and vindicate plaintiff in his choice of a common law remedy. No. 7, accordingly, constituted a permissible converse instruction.

Contrary to appellant's further objections to No. 7 it did not constitute a misdirection; par. 3 of § 287.040 *is* involved; the jury could find under the evidence that the machinery on which plaintiff was working *was* an "improvement" within the meaning of par. 3 and the definition of the word in Black's Law Dictionary, 4th Ed., p. 890, and could find that the improvement *was* being "repaired by an independent contractor," within the meaning of par. 3 and accepted definitions of the word "repaired."

■ Appellant contends that Instruction No. 2, MAI 3.01 modified (the burden of proof instruction), is erroneous because in stating that the burden was on defendant to cause the jury to believe the propositions necessary to support its three defenses (that plaintiff was an employee of defendant; that plaintiff was contributorily negligent, and that plaintiff was a statutory employee of defendant) the language is couched in the conjunctive, whereby the

---

4. No. 7: "Your verdict must be for plaintiff on Instruction Number 6 if you believe that on April 20, 1968, plaintiff as an independent contractor was repairing an improvement upon premises owned by defendant."

5. No. 6: "Your verdict must be for defendant if you believe:
    "First, Raymond W. Cline was an independent contractor; and

"Second, that at the time of his injury he was working about the premises of Carthage Crushed Limestone Company; and
    "Third, that the injury occurred while he was doing work which was an operation of the usual business there carried on by Carthage Crushed Limestone."

burden was placed upon defendant to cause them to believe each of the foregoing propositions, whereas defendant was entitled to a verdict if the jury believed any one of them; that the instruction should have followed Notes on Use, MAI 3.01, by stating that the burden was upon defendant to cause the jury to believe "the propositions necessary to support [its] defense that * * * and [its] defense that * * * and [its] defense that * * *." No. 2 is saved from appellant's criticism by the last sentence, which is MAI 3.01 verbatim, telling the jury that the propositions submitted are to be considered separately. The use of "and" was proper if we consider the form prescribed in Notes on Use, MAI 3.01, in cases where both a counterclaim and an affirmative defense are asserted, for in that situation the word "and" is *required* as the connecting word between the two. The only difference between the wording of No. 2 as given and as appellant claims it should have been given is that appellant would three times state and twice repeat the words "and his defense." The very first sentence of Notes on Use, MAI 3.01, however, suggests the advisability of not repeating phrases, and the same admonition applies to nonrepetition of words. The slight deviation, omitting the words "and his defense," is de minimus and does not constitute prejudicial error, especially in view of the tail on plaintiff's verdict-directing Instruction No. 3, which ends with this unmistakable language: " * * * unless you believe plaintiff is not entitled to recover by reason of Instruction Numbers 6, 8 or 10 * * *" (which three submitted the defenses above mentioned).

### III. Admissibility of Evidence

Over objection plaintiff's wife was allowed to testify that three or four weeks after the accident Elliott Potter and one Bryant, an insurance man, came to plaintiff's home to discuss the case, and that on that occasion Mr. Potter made this statement: "I consider this a liability case and the insurance company considers it a compensation case." Appellant claims that this was prejudicial hearsay; a legal conclusion and opinion invading the province of the jury; inadmissible if Mr. Potter had been testifying on the stand; without foundation showing that Mr. Potter was authorized by CCL to make that statement; without evidence of Mr. Potter's position with CCL; that declarations of an agent made after the act are hearsay and not admissible as an exception to the hearsay rule.

There was evidence from which the jury could find that at that time Mr. Potter was either president or vice-president of CCL; that he was the "top boss"; the "top one"; the general superintendent's superior; the chief executive officer and spokesman for CCL. While there was no evidence that Mr. Potter had been expressly authorized by the board of directors to discuss this case with the Clines or make declarations with respect thereto, there was none to the contrary. "A president of a corporation has incidental authority to make declarations and admissions binding upon his corporation, in matters which are within the scope of his ordinary duties; * * *," 19 C.J.S. Corporations § 1071, p. 608. A vice-president of a corporation "is clothed with ostensible authority to bind the corporation by his statements, * * *." Idem, p. 609. The jury could find that in visiting with Mrs. Cline at her home with respect to the injury to her husband Mr. Potter was on an errand of business for the corporation, acting within the scope of his duties, and that his acts, declarations and admissions on that occasion were attributable to the corporation he was representing. In Klaber v. Fidelity Bldg. Co., 19 S.W.2d 758, 763 [11–12] (Mo.App.1929), the statement of the president of a corporation to the widow of a carpenter killed while working on a house being built by the corporation, that she should not worry about the bills; that they would be "taken care of," was held admissible in evidence as an admission of responsibility, in a suit against the corporation. In Kaufman v. Baden Ice Cream

Mfrs., Inc., 7 S.W.2d 298, 300[2, 3] (Mo. App.1928), the statement of the president of a corporation, while discussing an accident with the family of a 16-year-old girl injured when struck by a company truck, admitting that a chauffeur in the general employ of the corporation was driving the truck and was delivering ice cream at the time, was properly admitted in evidence against the corporation. Pointing out that the girl's injuries and her claim for damages was a matter in which the corporation was vitally interested, the court said, 7 S.W.2d l.c. 300: "The legal presumption is that Fischer, the president of the corporation, who was its chief executive officer, in the absence of evidence to the contrary, had all the power usually incidental to such office, and under this state of the record we think it may be presumed that, since he went to the home of plaintiff to discuss this matter of damages with plaintiff's family, he was acting within the scope of his duties as president of the company." Mr. Potter's statement to plaintiff's wife went to the very core of the principal issue contested in this case: whether plaintiff is entitled to maintain a common law action or is relegated to a workmen's compensation claim. The statement itself would appear to be a legal conclusion on a mixed question of law and fact (although a "yes" answer on a form asking the question "Is the injury under the law?," where the phrase "under the law" was defined as "if it [an accident] arises out of and in the course of employment and at the time both employer and employee had expressly or impliedly accepted the law," was held to constitute an admission of *matters of fact* in Hall v. Denver-Chicago International, Inc., 481 S.W.2d 622, 626–627[5] (Mo. App.1972)). Whether the one or the other, this corporate party, speaking through its chief executive officer, "should be held responsible for statements of fact or opinion, previously made, which conflict with the position taken by [the corporation] in [this] judicial proceeding." Carpenter v. Davis, 435 S.W.2d 382, 384 (Mo. banc 1968). This is true even if it was the statement of an ultimate fact, since it was "based on facts of which the declarant could be expected to have had knowledge of or knowledge available to [him]." Wills v. Townes Cadillac-Oldsmobile, Inc., 490 S.W.2d 257, 260[4] (Mo.1973). Such a statement is admissible in evidence as an admission against interest, and while not conclusive or binding, is a circumstance for the consideration of the jury, for whatever it is worth. O'Neill v. Claypool, 341 S.W.2d 129, 134 [6–8] (Mo.1960). The inconsistency between Mr. Potter's extrajudicial statement and the position CCL took in defense of this action gave the statement logical relevancy and probative force. It tended to support plaintiff's position that he was not an employee and was free to sue at common law, and to negative CCL's defense that plaintiff was an employee restricted to his administrative remedy, Ozbun v. Vance, 323 S.W.2d 771, 776 [5] (Mo.1959), and was admissible for the consideration of the jury on the question of the validity and genuine character of CCL's trial position.

## IV. Excessive verdict?

█ Appellant makes the point that "The verdict was excessive and so excessive as to indicate bias and prejudice on the part of the jury and the excessive verdict was engendered and fomented by news articles in the Nevada Daily Mail."

Plaintiff, 54 years of age at time of injury, a welder by trade earning an average of $10,476 per year for the previous five years, in previous good health, sustained these injuries: a very badly mangled left arm, almost transected from the elbow down; a right knee wound; an open left side chest wound which extended into the abdomen, large enough to place a man's hand inside, fractured ribs, and significant blood loss. Two operations were performed during his hospitalization from April 20 to May 2. The left arm was amputated two inches below the elbow in the 3-hour first operation and the knee wound

debrided. The spleen was removed and diaphram repaired. Residuals include a 10-inch scar on the left chest, portions of the ribs missing, an incisional hernia which should be corrected by future surgery, a narrowing of the knee joint with degeneration from the accident and missing cartilage tissue, which is permanent; irregularity on surface of patella and a spurring; a limitation, weakness and "catch" in right leg in going up and down steps and in side-to-side motion; 50% abduction and limited flexion in left shoulder; permanent partial disability estimated by one doctor to be in the range of 80–85%, and by another as 40–50% of the body as a whole; no residual disability from the surgery or wounds in the chest cavity; no disability in right knee joint; prosthetic device fitted to left arm comfortable. Plaintiff demonstrates good control in operating the device. The injuries will not decrease plaintiff's life expectancy (18.09 to 21.75 years) but will cause recurrent episodes of knee pain, pain at shoulder joint, phantom limb pain through life and local pain in elbow stump which will affect the wearing and use of the artificial device. Medical, hospital and artificial arm bills totaled $3,053. For 36 months from accident to trial plaintiff's total gross income was $3,136. Plaintiff works around his home, mows his yard, does what work he can in his welding shop and goes deer hunting.

On the question whether this Court should set aside the verdict and judgment in its entirety as the product of bias and prejudice on the part of the jury, "* * * the mere size of a verdict—the fact that it may be excessive—does not in and of itself establish that it was the result of bias or passion and prejudice [citing three cases], without showing some other error committed in the trial." Skadal v. Brown, 351 S.W.2d 684, 690[16] (Mo. 1961); Nussbaum v. Kansas City Stock Yards Co. of Maine, 359 S.W.2d 335, 341 [6] (Mo.1962); McConnell v. Pic-Walsh Freight Co., 432 S.W.2d 292, 301[18–21] (Mo.1968); Allen v. Bi-State Development

Agency, 452 S.W.2d 288, 292 (Mo.App. 1970); Erny v. Revlon, Inc., 459 S.W.2d 261, 267[9, 10] (Mo.1970); Garvis v. K Mart Discount Store, 461 S.W.2d 317, 324 [12] (Mo.App.1970); Pryor v. American Oil Co., 471 S.W.2d 492, 496[5, 6] (Mo. App.1971). To establish "other error" appellant relies upon front-page newspaper articles appearing in two editions of the local newspaper printed in the city where the case was tried. The trial started May 24. Describing this litigation as a "large $250,000 civil suit" the article in the May 26 edition stated that the case "is to determine how much in damages should be awarded" to Cline; that if he received the $250,000 asked for "it will be one of the largest compensations—perhaps, the largest —ever given by a Vernon County jury." On the morning of May 27 counsel for appellant called the article to the court's attention and requested a mistrial, which was denied. There was no showing then, or later, that any juror had read or considered the article. The trial judge stated that he suspected that the jurors had read the article but in his experience juries "do not pay much attention to what they read in the newspaper." The court offered, if requested, to inquire of the jurors whether they had read the article, and apparently was ready to caution the jury with respect thereto, but counsel for appellant made no such request and the court did not conduct an inquiry on its own motion. The edition of May 27 carried an article stating that the jury was expected to deliver its verdict in this "suit to determine whether Cline should be awarded a quarter of a million dollars"; that the company had admitted negligence but was attempting to prove that Cline was an employee and not an independent contractor, as plaintiff claimed; that if the defense proved its case Cline would be granted only workmen's compensation but if plaintiff proved that he was an independent contractor plaintiff legally could be awarded damages. In support of plaintiff's position the court at the hearing of the motion for new trial was presented with an affidavit of the publisher stating

that the May 27 edition was not printed until approximately 2 p. m. on that day and that the first copies of the paper did not leave the newspaper office before 2:30 p. m. The transcript shows that the court adjourned for lunch at 11:40 a. m. on May 27; that the trial resumed at 12:15 p. m.; that the jury retired to deliberate at 2:35 p. m. and returned their verdict at 4:35 p. m. At the close of the case the jury was given Instruction No. 11: "You are again instructed to disregard any newspaper account or radio report which you might have read or heard at any time relating to this case or to the parties involved." No evidence was introduced at the hearing of the motion for new trial on the question whether the newspaper articles were read or considered by the jurors. On the uncontradicted facts shown by affidavit and the record the jurors did not see the May 27 article and therefore could not have been influenced by it, because as a physical fact the May 27 edition was printed and distributed during the afternoon session of the court, while the jury was occupied in the trial, and there was no opportunity for them to have seen it.

With respect to the *May 26* article, which the jurors could possibly have seen, the burden was on appellant, who claims prejudice, at least to establish that in fact it was seen by one or more jurors. Appellant presented no evidence on the question. Neither this Court nor the trial court has been given the means of knowing whether any juror read and considered the May 26 article. For this Court to upset this verdict and judgment on this basis would require surmise and speculation (1) that the jurors were informed of the contents of the May 26 article; (2) that they took it into consideration in arriving at their verdict and (3) that their consideration of the article worked to the disadvantage or prejudice of appellant. We cannot decide the point on surmise and speculation. The

trial judge offered to inquire of the jury whether they had read the article and was ready to admonish the jury to disregard newspaper accounts, but appellant did not avail itself of this offer. The court gave cautionary Instruction No. 11. The court had an opportunity to weigh the evidence on the question of outside influence twice: once on the morning of May 27 when the mistrial motion was argued; again when the motion for new trial was heard. There was no admission or proof that the May 26 article influenced the jury or affected the outcome of the case or that appellant was thereby prejudiced. After considering the matter the trial court approved the amount of the verdict. Considering the broad discretion allowed the jury in fixing the amount of an award; the fact that the verdict had the approval of the trial judge, and considering all of the evidence on the question of damages in the light most favorable to the verdict, we cannot say that the amount awarded shocks the conscience of the court or conclude that the broad discretion granted the jury and trial court has been arbitrarily exercised and abused. Under the rulings in Huffman v. Young, 478 S.W.2d 332 (Mo.1972); Long v. Hooker, 443 S.W.2d 178 (Mo.1969), and related cases, the verdict of the jury under these circumstances is conclusive on appeal.

We have not overlooked the question of mere excessiveness; whether although not the result of misconduct on the part of the jury the verdict is manifestly unjust; whether a remittitur should be ordered under the criteria reviewed and reannounced in Hart v. City of Butler, 393 S.W.2d 568, 580[22] (Mo.1965). Comparison of the injuries, special damages, percentage and permanence of residual disabilities, loss of earnings and loss of earning power in the future, relative ages and previous condition of health, changing economic factors, the compensation awarded and approved in cases of similar or fairly comparable injuries and damages,[6] between this case and

---

6. $125,000 for 1956 loss of left arm two inches below elbow and four fingers on right hand. Yost v. General Electric Co., 173 F. Supp. 630 (S.D.N.Y.1959).

$160,000 not excessive for 1962 loss of hand and wrist and musculature of remainder of arm. Marmo v. Chicago, Rock Island & Pac. R. Co., 350 F.2d 236 (7th Cir. 1965).

other cases reviewed, inflation and the decreasing purchasing power of the dollar, and giving consideration to the rule of uniformity of awards for similar injuries, we reach the conclusion that the award, while substantial, is not excessive or manifestly unjust, and that remittitur is not in order.

Judgment affirmed.

STOCKARD, C., concurs.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the Court.

All of the Judges concur.

$155,000 approved for amputation of left hand, decreased mobility of remaining forearm, inability to adapt to use of prosthetic device, and loss of income. Rivera v. Rockford Machine & Tool Co., 1 Ill.App.3d 641, 274 N.E.2d 828 (1971).

$200,000 not excessive for serious and painful injuries to head, face, both legs and back of 37-year-old railroad brakeman with 50% permanent disability of right leg, 35% disability of left leg and low back, loss of wages for one year and hospital and medical expense of $3,000. Benazet v. Atlantic Coast Line R. Co., 442 F.2d 694 (2nd Cir. 1971).

$500,000 approved as not excessive for 27-year-old freight train conductor who lost arm above elbow, loss of earnings computed at present value of $101,000, leaving $399,000 for pain and suffering and loss of arm. Seaboard Coast Line R. Co. v. McKelvey, 270 So.2d 705 (Fla.1972); court of appeal opinion, 259 So.2d 777.

$200,688 not excessive for loss of left arm and severe internal injuries to wholesale grain dealer who sustained 95% functional disability to right extremity, or 55–60% disability to the body as a whole. Texas and Pacific Ry. Co. v. Salazar, 458 S.W.2d 116 (Tex.Civ.App.1970).