Stella **BLACKBURN** and Claude H. Blackburn, **Plaintiffs-Respondents,**

v.

**KATZ DRUG COMPANY, Defendant-Appellant.**

No. 9652.

Missouri Court of Appeals,
Springfield District.

March 6, 1975.

William H. Burden, Jr., Joplin, for defendant-appellant.

Richard M. Webster, L. Thomas Elliston, Myers, Webster, Perry & Elliston, Webb City, for plaintiffs-respondents.

Before BILLINGS, C. J., and TITUS and FLANIGAN, JJ.

FLANIGAN, Judge.

The petition against defendant Katz Drug Company was in two counts. In Count I plaintiff Stella Blackburn sought damages for injuries she received while a

customer in defendant's store, alleging that one of defendant's employees "negligently pushed a cart into and against [Stella] knocking her to the floor and injuring her . . . ." In Count II plaintiff Claude H. Blackburn, husband of Stella, sought damages for loss of her services. The jury returned a verdict in favor of Stella for $7,000 and in favor of Claude for $3,000 on their respective counts. Katz appeals from the judgment entered thereon.

Of defendant's three complaints of error, two attack the trial court's giving of Stella's verdict-directing instruction number 3[1] and the third deals with the failure of the trial court to strike certain medical testimony.

The challenged instruction (MAI No. 22.03 modified):

"Instruction No. 3

Your verdict must be for the Plaintiff Stella Blackburn if you believe:

First, there was a cart moving down an aisle and as a result the intersecting aisle was not reasonably safe for customers, and

Second, Plaintiff Stella Blackburn did not know and by using ordinary care could not have known of this condition, and

Third, Defendant knew or by using ordinary care could have known of this condition, and

Fourth, Defendant failed to use ordinary care to warn of it, and

Fifth, as a direct result of such failure, Plaintiff Stella Blackburn was injured.

unless you believe Plaintiff Stella Blackburn is not entitled to recover by reason of Instruction No. 9."[2]

Katz makes no attack upon the form of instruction 3. Accordingly, this court need not, and does not, decide whether instruction 3 is a "correct statement of law" or a "complete statement" as those terms are used in Missouri Approved Jury Instructions, Second Edition, p. XXIII. This opinion decides only the points of error advanced by Katz. Pruellage v. DeSeaton Corp., Mo. 380, S.W.2d 403, 405[3] (Mo. 1964). Rule 84.04(d) V.A.M.R.

Katz expresses one of its two attacks upon instruction 3 in the following language: "The court erred in giving verdict directing instruction no. 3 relating to a dangerous intersecting aisle because there was not sufficient evidence relating to such alleged dangerous condition, defendant's control over and knowledge of such condition and its failure to warn of or remedy the same."

This attack upon instruction 3 requires a review of the evidence. In so doing, this court must consider the evidence in the light most favorable to Stella, giving her the benefit of all favorable inferences reasonably deducible therefrom and disregarding the evidence of Katz unless it tends to support the submission. Rickman v. Sauerwein, 470 S.W.2d 487, 489[1] (Mo.1971); Underwood v. Crosby, 447 S.W.2d 566, 570[6] (Mo.banc 1969).

Katz maintained a "retail store and place of business" at 7th and Range Line in Joplin, Missouri. On June 20, 1970, Stella went to the store to look at some slacks which had been advertised. She entered the store from the south and walked down a north-south aisle to look at the slacks. She made no purchase and "turned around and started back toward the door." She was walking south down the north-south aisle when she was struck by a "freight

1. The same attacks are leveled against instruction number 4 which submitted Claude's derivative claim. Those attacks meet the same appellate fate.

2. Instruction 9, offered by Katz, submitted contributory negligence of Stella, based on failure to keep a careful lookout.

cart"[3] being pushed eastwardly by James Williams, a Katz employee engaged in the course of his duties.

Stella did not see the cart before the impact "because the merchandise was piled so high on the counter that I couldn't see anything." There were boxes stacked on the cart and the first time Stella saw Williams was after the impact when Williams was "looking around the left side" of the boxes. She could not have seen him otherwise because "the boxes were too tall; taller than [Stella's] head."

Stella's vision was obstructed by "racks or displays" located at the northwest corner of the intersection of the two aisles. Stella's height is 5'2" and the racks were higher than her head, maybe 5'4". Prior to the impact Stella was walking at a normal rate and "might have been closer to one side of the aisle." The cart struck her from the right and rolled over her right foot and struck her left foot.

James Williams, who testified for Katz, stated that he first saw Stella at the instant of the impact. Williams was pushing the cart down the east-west aisle, which was about four feet wide. The north-south aisle, on which Stella was walking, was characterized by Williams as "the main aisle." Though the width of that aisle is not shown by the testimony, photographs introduced by Stella indicate that its width was approximately the same as that of the east-west aisle. Williams could not recall whether the displays at the northwest corner of the intersection were high enough to obstruct his view of Stella's approach. Williams said that prior to the impact "I was looking straight east, straight ahead." He did not know whether he could have seen Stella had he been looking to the left. The cart went into the intersection of the two aisles, Williams did not remember how far, "but more than a foot." The impact occurred "in the middle

of both aisles." The cart was moving when it struck Stella. The cart was used for the purpose of transporting merchandise from one portion of the store to another. Prior to the impact Williams was walking at a normal rate.

"Fundamentally, the basis of a proprietor's liability in a case of this nature is his superior knowledge of the defective condition of his premises which results in injury to his business invitee. . . . If a proprietor knows, or in the exercise of ordinary care should know, of a dangerous condition of his premises which involves an unreasonable risk of harm to his invitee, and of which the invitee, in the exercise of ordinary care, does not or should not know, a recovery will be permitted against the proprietor. . . . But if the dangerous condition is obvious and known, or in the exercise of ordinary care should be known, by the invitee, actionable negligence is not established, and the invitee will not be permitted to recover." Hokanson v. Joplin Rendering Company, Inc., 509 S.W.2d 107, 110[3, 4] (Mo.1974).

In *Hokanson* the Supreme Court quoted §§ 343 and 343A(1), Restatement of the Law of Torts, Second (1965). *Hokanson* supra, p. 110. In § 343, p. 216, Comment b, it is said: "[A]n invitee enters upon an implied representation or assurance that the land has been prepared and made ready and safe for his reception. He is therefore entitled to expect that the possessor will exercise reasonable care to make the land safe for his entry, or for his use for the purposes of the invitation. He is entitled to expect such care not only in the original construction of the premises, *and any activities of the possessor or his employees which may affect their condition,* but also in inspection to discover their actual condition and any latent defects, followed by such repair, safeguards, or warning as may be reasonably necessary for his

---

3. The evidence contained the following description of the cart: "A green four wheel cart, 17 inches wide, 42 inches long. The bed is 5 inches from the floor and the back is 36 inches high; it weighs approximately 25 poounds and has no shelves or racks."

protection under the circumstances." (Emphasis added).

In varying factual situations,[4] Missouri courts have found negligence on the part of a store proprietor with respect to aisle conditions.

Liability for injuries resulting from *active conduct,* as distinguished from conditions of the premises, has been imposed upon the landowner or possessor who fails to exercise ordinary care toward a licensee whose presence on the land is known or should reasonably be known to the owner or possessor. Anderson v. Welty, 334 S. W.2d 132, 136[6] Mo.App.1970 (licensee injured by cattle being driven by defendant's agent). See also Penberthy v. Penberthy, 505 S.W.2d 122, 129 (Mo.App. 1973).

■ Stella had a right to expect an unobstructed aisle. Armstrong v. Kroger Grocery & Baking Co., 78 S.W.2d 564, 571 (Mo.App.1935); O'Bauer v. Katz Drug Co., 49 S.W.2d 1065, 1069 (Mo.App.1932); Blackwell v. J. J. Newberry Co., 156 S.W. 2d 14, 17 (Mo.App.1941); Ward v. Temple Stephens Company, 418 S.W.2d 935, 938 (Mo.1967). "One is not required to look for danger when he has no cause to anticipate it, or when danger would not exist but for the negligence of another . . ." Anderson v. Welty, supra, 334 S.W.2d at 138[8].

Whether or not there was sufficient evidence to submit the issue of Stella's contributory negligence, that issue was in fact submitted to and rejected by the jury. Katz does not claim here that the conduct of Stella amounted to contributory negligence as a matter of law. The obstructions at the northwest corner of the intersection of the aisles made it a "blind" one. The jury found that the condition of danger did exist at this intersection because of the approach of the cart being pushed by Williams. Unlike Stella, Williams knew the cart was approaching the blind intersection. The knowledge of Williams was the knowledge of Katz. Schaaf v. St. Louis Basket & Box Co., 151 Mo. App. 35, 131 S.W. 936, 940[4], opinion adopted 160 Mo.App. 598, 140 S.W. 1197; 57 C.J.S. Master & Servant § 570, p. 311. The cart did partially enter the intersection and the fact that it was in motion at the time of the impact did not make it less dangerous than a static projection.

Missouri courts take judicial knowledge that the average walking speed is 2.9 to 4.4 feet per second. Miller v. St. Louis Public Service Company, 389 S.W.2d 769[5] (Mo.1965). Since there was evidence that the cart had entered the intersection only a foot or so, the jury could find that it was visible to Stella substantially less than one second prior to the impact, a length of time insufficient for her to react to its approach. These are conditions of which the defendant, through Williams, had knowledge. These conditions were unknown to Stella.

Stella's injuries stemmed from a combination of a condition of the premises (the view-obstructing racks or displays in the northwest corner of the intersection) and the active conduct of Williams in pushing the loaded cart, a combination which the jury could and did find "was not reasonably safe for customers."

■ Thus, the contention of Katz that "there was not sufficient evidence relating to such alleged dangerous condition" has no merit.

---

4. O'Bauer v. Katz Drug Co., 49 S.W.2d 1065, Mo.App. 1932, (table in aisle); Armstrong v. Kroger Grocery & Baking Co., 78 S.W.2d 564, Mo.App.1935, (basket "extended out into aisle"); Blackwell v. J. J. Newberry Co., 156 S.W.2d 14, Mo.App.1941, (stepladder in aisle). See 26 A.L.R.2d 675 (Liability for injury to customer from object projecting into aisle or passageway in store). See also an Oklahoma case, Fleming v. Allied Supermarkets, 236 F.Supp. 306 (1964), where a storekeeper was held liable for injury sustained by a customer struck by a cart being propelled through aisle by a small child (whose vision was impaired by another child riding in the cart) since the storekeeper either knew or should have known of the dangerous condition and did nothing to remedy it.

In the argument portion of its brief Katz states: "There was no evidence produced concerning the defendant's responsibility for the area where the accident happened. Hypothetically the same could have been under the control of a landlord or a lessee." The legal validity of this contention need not be explored for the reason that it is factually unsound. Katz had admitted that portion of the petition which pleaded that Katz "maintained a retail store and place of business at 7th and Range Line in Joplin." Dale Pool, a witness for Katz, identified photographs, admitted in evidence, as showing a portion of Katz's store and Stella testified that the accident took place in an area shown in the photographs. The conduct of Williams was that of Katz. There was sufficient evidence relating to Katz's "control."

So far as Katz's "knowledge of such condition" is concerned, the evidence was sufficient. The operation of the cart by Williams was, of course, a condition caused and created by him. It follows that Katz had knowledge of that condition. Cline v. Carthage Crushed Limestone Co., 504 S.W.2d 102, 111[4, 5] (Mo.1973). Indeed, in *Cline* the court held that the element of knowledge of the condition, where it was created by defendant's employees, need not be included in the instruction and under those circumstances deletion of paragraph third of MAI 22.03 was not error. "In such circumstances the question of notice, actual or constructive, was not in the case." *Cline,* supra, p. 111.

Katz had knowledge of the manner in which the view was obstructed by the racks or displays at the northwest corner of the intersection, since Katz had "management and control" of the manner of its display and there was no evidence of any third person having any connection therewith. Pollard v. J. J. Newberry Co., 228 S.W.2d 398, 400[3, 4] (Mo.App.1950). Leisure v. J. A. Bruening Company, 315 S.W.2d 705, 708[4] (Mo.1958). Although those two cases were submitted under the doctrine of res ipsa loquitur and this one

was not, there was evidence here by Katz's witness Neva Smith with regard to the racks and displays being "stacked kind of high" and concerning the height "we generally keep them." Another witness for Katz, assistant manager Pool, described the methods of display and the heights thereof. From this the jury could reasonably infer that Katz, through its employees, created the display which made the intersection a blind one.

Stella received no warning of the approach of the cart and obviously Katz did nothing to remedy the dangerous condition arising from its approach to and partial entry of the blind intersection.

Accordingly, this court rejects the assertion that instruction 3 lacked sufficient evidentiary support in the particulars set out by Katz.

Katz's second attack upon the giving of instruction 3 is that the instruction was "inconsistent with the theory of plaintiffs' petition alleging that defendant's employee negligently pushed a cart into [Stella] and therefore authorized recovery on an unpleaded ground."

This contention of Katz is unsound. Katz made no objection to any of the foregoing evidence on the ground that such evidence was outside the scope of the pleadings or inconsistent therewith. Indeed Katz introduced much of that evidence. "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues." Rule 55.33(b) V.A.M.R. Middleman v. Complete Auto Transit Co., 486 S.W.2d 456, 461 [8, 9] (Mo.banc 1972).

The final complaint of Katz is that the trial court erred in "failing to strike the testimony of A. R. Mueller, M.D., when it became apparent that his opinion concerning the physical condition of [Stella] related, in part, to an osteoporotic condition, and the creation or aggravation of such condition was not alleged in plaintiffs' petition."

The subject of osteoporosis was initially injected into the case by Katz. Counsel for Stella made no reference to osteoporosis in his opening statement but the opening statement of counsel for Katz contained the following: "[T]he medical evidence in this case will be that the present complaints that she has are primarily attributable to a preexisting arthritic and osteoporotic condition. What the significance of the word 'osteoporotic' will be explained to you by the physicians who come into court."

Dr. Mueller, an orthopedic surgeon, testified on behalf of Stella. On direct examination he stated that he saw Stella three times, the first being approximately one month prior to the trial and more than three years after the accident. Stella was concerned primarily with her right ankle which she said she had injured three years previously in the Katz accident. She complained of pain in the ankle, which was swollen, and she had difficulty in walking. Dr. Mueller took x-rays "which showed that most of the bones in ankle area and the foot were porotic. . . ." The word "porotic" means a loss of mineral in the bone. "This can be the after effects of trauma" but usually demineralization is not associated with trauma. Demineralization can be painful. When the doctor saw Stella, she was using a crutch and "I am sure she needed it because her ankle looked to me like it would be painful."

The foregoing testimony was received without objection.

In response to a hypothetical question [5] Dr. Mueller stated that in his opinion "these conditions in her foot were a result of this injury that she suffered three years ago."

On cross-examination by counsel for Katz, the following occurred:

"Q. Doctor, is it your opinion that she is suffering from aggravated arthritis or from osteoporosis?

A. Well, the x-rays show some narrowing in the joints which may or may not have originated prior to this injury. She has osteoporosis in the bones of this foot at this time.

Q. Is that the basis for your opinion that the primary thing she is having trouble with is osteoporosis?

A. Of course, that is the result of the pain and the disuse she has had of this foot.

Q. My question to you is this: She has pain—you're saying she has pain, isn't that what she told you?

A. That is what she told me.

Q. What I'm asking you is what is the cause of that pain; is it arthritis or osteoporosis?

A. I suppose it's a combination of both.

MR. BURDEN: Well, Your Honor, at this time I would like to move to have the Doctor's testimony stricken for the reason that there is no allegation in the Petition concerning osteoporosis. That is not a natural consequence of the injury that she received. It has not been plead and I think therefore, his entire testimony is improper.

THE COURT: The objection will be overruled."

---

5. The question included a description of the Katz accident and the fact that Stella, prior thereto, had received medication for a preexisting arthritic condition, aggravation of which had been pleaded in the petition.

"No appellate court shall reverse any judgment, unless it finds that error was committed by the trial court against the appellant materially affecting the merits of the action." Rule 84.13(b) V.A.M.R. Viewing Dr. Mueller's testimony in its entirety, this court holds that the trial court did not err in failing to strike "his entire testimony."

On direct examination the witness gave his unequivocal opinion that the conditions in Stella's foot resulted from the Katz accident. The term "osteoporosis" was not used on direct examination. There was reference to demineralization which "can be painful" but, on direct examination, the witness stated that usually demineralization is not associated with trauma. It is thus apparent that there was no attempt by Stella, on direct examination, to adduce evidence to the effect that her complaints were due to a condition of osteoporosis and that such condition was caused or aggravated by the accident. When asked, on direct examination, whether demineralization is "automatically associated" with pain, the witness responded "It can be painful." The jury could reasonably infer from that testimony that pain may, but does not always, accompany demineralization.

The first use of the term "osteoporosis," during the testimony of Dr. Mueller, took place on cross-examination. The witness said that Stella does have osteoporosis "at this time." When asked whether the cause of Stella's trouble was osteoporosis, the witness did not make an unequivocal affirmative response. His answer is subject to the construction that Stella's trouble "is the result of the pain and the disuse she has had of this foot." This testimony is not totally inconsistent with the testimony on direct examination attributing the conditions in her foot to the Katz accident.

Apparently recognizing this, Mr. Burden asked his final question with regard to the cause of the pain. The witness gave his supposition [6] that is was a combination of arthritis and osteoporosis. There was no showing of such inconsistencies in the testimony of Dr. Mueller as would destroy the probative value of his testimony. Stahlheber v. American Cyanamid Company, 451 S.W.2d 48, 58[5] (Mo.1970); Perry v. City of St. Louis, 344 S.W.2d 661, 666 (Mo.App.1961).

 "The jury must consider the testimony of the medical witness expert as a whole, and the fact that his testimony on cross-examination is inconsistent with his testimony in chief does not necessarily destroy the effectiveness of his opinions." 32 C.J.S. Evidence § 569(3), p. 623. Katz makes no complaint that the verdict on either count was excessive.

The judgment is affirmed.

All concur.

---

6. "The jurors were not required . . . to embrace the inconclusive, *suppositious* opinion testimony of [plaintiff's] only medical witness . . . ." Chapman v. King, 396 S.W.2d 29, 35 (Mo.App.1965).