Albert L. BLEVINS and Linda Blevins, Plaintiffs-Respondents,

v.

CUSHMAN MOTORS, a Division of Outboard Marine Corp., a Corporation, Defendant-Appellant.

No. 59807.

Supreme Court of Missouri, en banc.

May 10, 1977.

Rehearing Denied June 14, 1977.

*Indus. v. Leachman,* 529 S.W.2d 153, 158 (Mo. 1975); *Gershman Inv. Corp. v. Danforth,* 517 S.W.2d 33, 34–36 (Mo. banc 1974).

Joseph A. Sherman, Kansas City, for defendant-appellant.

James S. Formby, Kansas City, for plaintiffs-respondents.

DONNELLY, Judge.

This is a products liability case. The facts of the case and that portion of this opinion which pertains to Cushman's first and second contentions on appeal (I and II) were written in this Court. The balance of the opinion was written by Judge Wasserstrom in the Court of Appeals and is adopted here, substantially as originally written, without quotation marks.

On the afternoon of July 15, 1969, plaintiff, Albert L. Blevins, and his occasional golfing partner and former co-worker, Kermit Maxwell, met to play golf at Stayton Meadows Golf Course. After splitting between them the rental cost of a three-wheeled golf cart manufactured by Cushman, the two men completed the first nine holes of an intended eighteen holes of golf.

The first three holes of the back nine were played with the aid of the golf cart without incident.

At the thirteenth tee, Maxwell began play by slicing his tee shot slightly to the right. Plaintiff's first shot off the tee hooked somewhat to the left. The two men proceeded in the cart to Maxwell's ball, and he made his second shot. Maxwell then drove the two of them in the cart toward the plaintiff's ball. The cart was steered in a gradual turn toward its destination at a speed estimated by plaintiff to be approximately nine miles per hour. While the turn was being executed, Maxwell lifted his foot from the accelerator causing the speed of the cart to decrease to perhaps as low as five miles an hour. As the vehicle neared plaintiff's ball, the cart was driven out of the bright sunlight onto a shaded area of the golf course on which a light dew was present. Upon entering the shaded area the cart "skidded, tipped and turned over." The cart slid to the left "like being on ice" for ten to fifteen feet before overturning.

As the golf cart overturned, Maxwell was thrown clear; however, plaintiff, despite his attempt to jump from the cart, fell to the ground on his back and was pinned beneath the rolling cart when it came to rest.

Plaintiff, Albert L. Blevins, initiated this action for personal injuries in the Circuit Court of Jackson County in which his spouse also sought damages for loss of consortium resulting from the accident involving the golf cart manufactured by Cushman. During the course of the trial, the defendants, other than Cushman, reached a settlement with the plaintiffs.

The case was submitted to the jury on the theory of strict liability in tort as expressed in MAI 25.04. The jury returned a verdict of $73,000 for Albert and $21,000 for his spouse, Linda. Judgment was entered in the respective amounts of the two verdicts, reduced by $1,500 each to reflect payments made by those defendants who set-

tled. Following entry of judgment for the plaintiffs, Cushman perfected an appeal to the Court of Appeals, Kansas City District, where the judgment was affirmed. The cause is now before this Court to be decided as if on original appeal. Mo.Const. Art. V, § 10.

## I

On appeal, Cushman's first contention is that the trial court erred in overruling its motion for directed verdict for the reason that plaintiffs failed to make a submissible case. Among the several alternative arguments posited by Cushman, three challenge the submissibility of plaintiffs' case under theories of warranty and negligence. Since plaintiffs submitted a case based on strict liability in tort to the jury under MAI 25.04, it is unnecessary to address the sufficiency of the evidence to establish a submissible case under other theories.

With regard to the submissibility of plaintiffs' case on the theory of a strict liability in tort, Cushman mounts the following attacks: (1) strict liability in tort is inapplicable in cases in which the alleged defect is in the design of the product; (2) even assuming strict liability in tort is applicable to defective design cases, the proof necessary to establish a defective design in strict liability in tort is essentially the same as that required to prove a design defect in negligence; and (3) further assuming that strict liability applies in this case, the golf cart should be viewed as a product which is "unavoidably unsafe."

First, we cannot sustain Cushman's contention that strict liability in tort does not apply to defective design cases. In *Keener v. Dayton Electric Mfg. Co.*, 445 S.W.2d 362, 364 (Mo.1969) we recognized the concept of strict liability in tort as stated in 2 Restatement, Law of Torts, Second, § 402A.[1] We adopted this new cause of action in *Keener* " 'to insure that the costs of injuries resulting from defec-

1. In *Keener*, 445 S.W.2d at 364, appears an error in the quotation from 2 Restatement, Law of Torts, Second, § 402A. The words "*reason-* *ably* dangerous" should read "*unreasonably* dangerous."

tive products are borne by the manufacturers [and sellers] that put such products on the market rather than by the injured persons who are powerless to protect themselves.' *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897, 901, 13 A.L.R.3d 1049." Significantly, in *Greenman*, the product involved was found to be unsafe due to its defective design.

In *Keener*, this Court established that an action sounding in strict liability in tort may lie to recover for injuries caused by a product which is unreasonably dangerous *as manufactured.* It is only logical that in this case we permit an action in strict tort liability to obtain for the recovery for injuries caused by a product which is unreasonably dangerous *as designed* because,

> "[T]here is no rational distinction between design and manufacture in this context, since a product may be equally defective and dangerous if its design subjects protected persons to unreasonable risks as if its manufacture does so." *Pike v. Frank G. Hough Co.*, 2 Cal.3d 465, 85 Cal.Rptr. 629, 636, 467 P.2d 229, 236 (banc 1970).

Already in Missouri, the Court of Appeals has recognized that defective design cases are cognizable under strict liability in tort. *Higgins v. Paul Hardeman, Inc.*, 457 S.W.2d 943 (Mo.App.1970); *See also, Hoppe v. Midwest Conveyor Co., Inc.*, 485 F.2d 1196 (8th Cir. 1973). In fact, the clear majority of jurisdictions which have confronted the issue have applied strict liability in tort to defective design cases. *Mather v. Caterpillar Tractor Co.*, 23 Ariz.App. 409, 533 P.2d 717 (1975); *Cronin v. J. B. E. Olson Corp.*, 8 Cal.3d 121, 104 Cal.Rptr. 433, 501 P.2d 1153 (1972); *Bradford v. Bendix Westinghouse Automotive Air Brake Co.*, 33 Colo.App. 99, 517 P.2d 406 (1973); *Rindlisbaker v. Wilso*, 95 Idaho 752, 519 P.2d 421 (1974); *Allen v. Kewanee Machinery and Conveyor Co.*, 23 Ill.App.3d 158, 318 N.E.2d 696 (1974); *Phipps v. General Motors Corp.*, 363 A.2d 955 (Md.App.1976); *Brandenberger v. Toyota Motor Sales, U. S. A., Inc.*, 162 Mont. 506, 513 P.2d 268 (1973); *Bexiga v. Havir Mfg.*

*Co.*, 60 N.J. 402, 290 A.2d 281 (1972); *Deem v. Woodbine Mfg. Co.*, 89 N.M. 50, 546 P.2d 1207 (N.M.App.1976); *Seibel v. Symons*, 221 N.W.2d 50 (N.D.1974); *Phillips v. Kimwood Machine Co.*, 269 Or. 485, 525 P.2d 1033 (1974); *Engberg v. Ford Motor Co.*, 205 N.W.2d 104 (S.D.1973); *Pizza Inn, Inc. v. Tiffany*, 454 S.W.2d 420 (Tex.Civ.App.1970); *Seattle-First National Bank v. T. E. Tabert*, 86 Wash.2d 145, 542 P.2d 774 (banc 1975); *Arbet v. Gussarson*, 66 Wis.2d 551, 225 N.W.2d 431 (1975).

Our acceptance of strict liability in tort in defective design cases "eliminates proof as to violation of the standard of reasonable care" with respect to the adoption by a manufacturer of a particular product design. *Hoppe*, supra, 485 F.2d at 1199. We reaffirm that a product may be found to be in a "defective condition *unreasonably dangerous* to the user or consumer or to his property," and, therefore, actionable under § 402A, when the product is found to be "defective and dangerous when put to a use reasonably anticipated" by the manufacturer. *Keener*, supra, 445 S.W.2d at 366.

Second, with reference to the application of strict liability in tort to defective design cases, Cushman maintains that in such cases strict liability and negligence are essentially the same; thus, that Cushman's conduct should be examined in the light of traditional negligence. Admittedly, in one jurisdiction which has adopted strict liability in tort in defective design cases, it has been conceded that the application of strict liability or of negligence will usually produce the same result. E. g., *Cronin v. J. B. E. Olson, Corp.*, supra, 501 P.2d at 1162.

Nonetheless, there exists an important distinction between the two concepts. In negligence cases the duty owed is based on the foreseeable "or reasonable anticipation that harm or injury is a likely result of acts or omissions." *Hull v. Gillioz*, 344 Mo. 1227, 130 S.W.2d 623, 628 (1939); *Taylor v. Hitt*, 342 S.W.2d 489, 494 (Mo.App.1961). On the other hand, strict liability in tort is based in part on the foreseeable or "reasonably anticipated" *use* of the product, *Keener*, su-

pra, 445 S.W.2d at 366, rather than on the reasonably anticipated *harm* the product may cause.

■ Stated another way, the difference between negligence and strict liability in tort in defective design cases,

" * * * is in strict liability we are talking about the condition (dangerousness) of an article which is designed in a particular way, while in negligence we are talking about the reasonableness of the manufacturer's actions in designing and selling the article as he did. The article can have a degree of dangerousness which the law of strict liability will not tolerate even though the actions of the designer were entirely reasonable in view of what he knew at the time he planned and sold the manufactured article."

*Phillips v. Kimwood Machine Co.*, 269 Or. 485, 525 P.2d 1033, 1037 (banc 1974); *Roach v. Koronen*, 269 Or. 457, 525 P.2d 125, 129 (1974).

■ Finally, as to Cushman's contention that the golf cart should be viewed as a product which is "unavoidably unsafe," the following explanation in comment k to § 402A is pertinent:

"k. *Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk."

In our opinion, golf carts are not "incapable of being made safe for their intended and ordinary use."

■ Plaintiffs submitted their case on a theory of strict liability in tort. "To establish the manufacturer's liability it was sufficient that plaintiff proved that he was injured while using the [golf cart] in a way it was intended to be used as a result of a defect in design and manufacture of which plaintiff was not aware that made the [golf cart] unsafe for its intended use." *Greenman*, supra, 27 Cal.Rptr. at 701, 377 P.2d at 901. According to the evidence, the stability of the cart could be improved by widening the wheel base, by use of four wheels, by lowering the center of gravity, by increasing its minimum turning radius, and by decreasing its maximum speed. On the basis of the evidence adduced, we believe plaintiffs made a submissible case.

## II

■ Plaintiffs' statement of their case against Cushman was contained in Counts VII and VIII of plaintiffs' First Amended Petition. Count VII pleaded implied warranty. See *Morrow v. Caloric Appliance Corporation*, 372 S.W.2d 41 (Mo. banc 1963). Count VIII pleaded negligence. Cushman

claims that the submission by plaintiffs of their case to the jury on a theory of strict liability under *Keener,* supra, constituted an impermissible substitution of a cause of action not pleaded.

In the abstract, Cushman's contention has merit. In *Keener,* we pointed out that the main advantage to be gained from adopting the *Restatement* theory "could be release from the shackles of warranty language." While the difference between *Morrow* and *Keener* is not one of substance, they do not represent the same cause of action. However, *in this case,* Cushman's contention cannot be sustained. We must conclude from the record that all parties understood the *Keener* concept was being pursued by plaintiffs and that the *Keener* issues were tried by implied consent of the parties. Rule 55.33(b).

### III

For its third point Cushman challenges the admission of the testimony of plaintiffs' expert witness concerning tests made by him and opinions reached by him based on those tests. Cushman objects that one type of test made by that expert was not under substantially similar conditions to those which existed at the time and place of the accident in question, thereby depriving the test of a proper foundation.

Plaintiffs' expert, Jon Shannon McKibben, qualified to the trial court's satisfaction as an engineer expert in the testing of automotive vehicles with respect to safety design. He attempted to obtain a Cushman cart, Model No. 881602, which was the model number of the cart in which Albert Blevins was injured, but was unable to do so. He did obtain a Cushman cart, Model No. 898102, which McKibben then subjected to a number of different tests. One of these tests consisted of McKibben driving the cart himself, thereby making certain subjective observations. He also conducted a "tilt test" on the basis of which he made certain mathematical computations in order to arrive at a determination of the center of gravity of the cart and a projection concerning the rate of speed and the degree of curve at which the cart would overturn. He then also conducted a series of "dynamic" tests which consisted of operating the cart at various speeds and putting it into a turn to ascertain at what point an overturn would occur. In addition, McKibben made a personal inspection of hole number 13 at Stayton Meadows Golf Course in Kansas City. On the basis of all these, McKibben gave his opinion that the cart was defective and unsafe.

Cushman objects that the dynamic experiments should not have been admitted into evidence and that McKibben's opinion based at least in part thereon should not have been permitted because of the following differences between the conditions under which McKibben conducted these tests as compared to the conditions at Stayton Meadows Golf Course on July 15, 1969: McKibben used a different model of Cushman cart; there were no golf bags on the back of the golf cart when tested; the cart carried two anthropometric dummies instead of human beings; the ground in California where the tests were made was harder and the turf more coarse than that at Stayton Meadows; the test cart was operated by remote control which required a steady rate of speed and putting the cart into a full turn; and the California test area was dry as compared to the wetness from dew on the portion of the Stayton Meadows Golf Course where the overturn occurred.

Plaintiffs answer these objections by pointing to McKibben's testimony that he had the plans and specifications for both of the Cushman Models 881602 and 898102, that he compared them and there were no differences which would be of any significance in terms of performance; that the anthropometric dummies were as close as science could come to duplicating the human body in a crash vehicle; that while each of the dynamic tests had to be at a steady rate of speed, more than one test was made at more than one rate of speed; that although the cart was put into a turn by mechanical remote control, the cart could be observed at different rates of turn

as the cart described a progressively more narrow arc and that the cart actually overturned at an early point after each turn commenced; that the absence of golf bags on the back of the cart was actually a factor to Cushman's advantage since the presence of golf bags would have raised the center of gravity even higher; and that the other differences complained of by Cushman were all differences which were to Cushman's advantage and of which it therefore should not be heard to complain.

 The law is well settled that experimental evidence is admissible when the experiment was made under conditions substantially similar in essential particulars to the conditions which prevailed at the time of the occurrence in suit, and that the conditions need not be identical. *Faught v. Washam*, 329 S.W.2d 588, 598 (Mo.1959); *Wilcox v. St. Louis-Southwestern Railroad Co.*, 418 S.W.2d 15 (Mo.1967); *Klaesener v. Schnucks Markets, Inc.*, 498 S.W.2d 555, 557 (Mo.1973). The similarities must be in those circumstances or conditions as might supposedly affect the result in question; and the degree of similarity or difference should be judged in the light of the fundamental principle that any fact should be admissible which logically tends to aid the trier in determination of the issue. *Ward v. Penn Mutual Life Insurance Co.*, 352 S.W.2d 413, 425 (Mo.App.1961). In determining this question of sufficient similarity, a substantial measure of discretion must be accorded to the trial judge. *Klaesener v. Schnucks Markets, Inc.*, supra; *Lietz v. Snyder Manufacturing Co.*, 475 S.W.2d 105, 107 (Mo.1972); *Lynch v. Railway Mail Association*, 375 S.W.2d 216 (Mo.App.1964); *Ward v. Penn Mutual Life Insurance Co.*, supra. The trial court in this case determined that the test conditions were sufficiently similar to those which obtained at the time and place of the accident and no abuse of that exercise of discretion has been made to appear.

## IV

As its next point, Cushman contends that the court erred in permitting plaintiffs' attorney to argue that Cushman had a right to a pretrial physical examination and that the jury could infer that such an examination would not have produced any testimony different from that given by plaintiffs' doctors. Cushman had in fact been accorded an examination of Albert Blevins by a doctor of its choice, Dr. Ellfeldt. Through inadvertence plaintiffs' lawyer neglected to get this fact into evidence. At the close of all the evidence, Cushman's attorney, in a conference held outside the hearing of the jury, requested a ruling that plaintiffs' attorney not be permitted to make any comment on the absence of Dr. Ellfeldt.

At this conference the following colloquy occurred:

"THE COURT: All right. Any other record you gentlemen wish to make?

MR. SHERMAN: Yes, Your Honor.

Prior to this conference in chambers, I asked Mr. Formby if he intended to comment upon the absence of Dr. Howard J. Ellfeldt, who did examine for the defendants. Dr. Ellfeldt's name has not been mentioned in evidence. It would thus be improper, and we would object and ask that the Court instruct plaintiffs' counsel to not comment on the absence of Dr. Ellfeldt inasmuch as there's no evidence regarding any examination by Dr. Ellfeldt.

MR. FORMBY: Your Honor, I believe the Court will recall, during the cross-examination of Albert Blevins, it was brought out that he had gone to another doctor, at the request of Mr. Sherman. I don't believe that he mentioned his name, and I have no intention to mention his name, but I do intend to comment on the fact that he did not bring in the doctor who he had requested Mr. Blevins to go to see.

THE COURT: Mr. Sherman, has Mr. Formby correctly stated it? Was it brought out in direct examination that he had been to see a doctor at the direction of the defendant or at the request of the defendant, but the doctor's name was not mentioned?"

Cushman's attorney then made specific reference to the transcript as to the testimony on this point. Then the court made the following ruling:

"THE COURT: Well, I think in view of the fact that it's not in evidence that the objection will be sustained and it's not a proper matter for comment at the time of closing."

In the jury argument which then followed, plaintiffs' attorney made the following argument:

"It's undenied, they brought no doctor into this courtroom, and they have the right to have the man examined—

MR. SHERMAN: Your Honor, this is objected to. This is not proper argument. Counsel knows full well that it isn't. We don't have the burden of proof in this case. The burden is on the plaintiffs. He's arguing contrary to the law and the instructions of the Court.

THE COURT: The objection will be overruled.

MR. FORMBY: They have the right under the law, this is the law of Missouri, that every person who files a lawsuit claiming injuries, they have a statutory right to have him examined by a physician, at their request, and to call that physician into the courtroom to testify. And I'm going to tell you the only reason they didn't do it is because any honest physician of integrity would have made a diagnosis and finding exactly like the hospital records and like Dr. Szabados."

■ Cushman contends that argument was reversibly erroneous on a twofold basis. It argues, first, that this portion of plaintiffs' jury argument defied the ruling made by the trial court in chambers. However, plaintiffs' counsel states in his brief that he honestly understood the court's ruling to mean only that he should not make specific reference to Dr. Ellfeldt by name. The trial judge is the one who made the ruling and he was in a much better position than is this court to determine whether plaintiffs' counsel defied the ruling made in chambers and if so what corrective measure, if any, was required. If this were all that was involved in this point, there clearly would be no occasion for interference by this court with the disposition made by the trial court.

■ But Cushman says there is more. It places its principal emphasis on the provisions of Rule 60.01, under which a party may obtain a physical examination of his adversary by an order of court and which further provides that "[t]he order may be made only on motion for good cause shown * * *." Cushman further relies upon *Stubenhaver v. Kansas City Rys. Co.*, 213 S.W. 144 (Mo.App.1919) and *Hoffman v. Illinois Terminal Railroad Co.*, 274 S.W.2d 591 (Mo.App.1955), which held that it was prejudicial error for a plaintiff to argue to the jury that the defendant has an absolute right to obtain a pretrial physical examination of the plaintiff.

Cushman urged this as one of its grounds for a new trial, and in response the trial court held as follows:

"Another claim of error was the Court's failure to admonish plaintiffs' counsel in final argument after objection about his statement that the defendant had the right to have the plaintiff examined by a doctor of his choosing. The Court was in error in not sustaining the objection to that remark. The Court recognizes that absent the agreement of the parties, plaintiff can only be examined by defendant's doctor on court order. The Court's rationale in not sustaining the objection is two-fold: First, defendant did have the plaintiff examined but did not call its doctor; second, despite case law to the contrary, this Court feels it is foolish to deny to the jury what, in reality, is true.

In the opinion of the Court, the defendant here because of the circumstances of the case had an absolute right to have the plaintiff examined and if any Court had denied defendant that right, it is believed that prejudicial error would have been committed by such denial.

In reflection, the Court believes that the objections should have been sustained because of case requirements, but it is not felt that reversible error was committed in failing to sustain the objection."

The latter of the two points stated by the trial court could not be sustained without reconsideration of the rulings of *Stubenhaver* and *Hoffman* and reinterpretation of the provisions of Rule 60.01. However, that portion of the trial court's reasoning was not necessary to its ruling. The first of the two reasons stated by the trial court sufficiently distinguishes the prior case law mentioned.

The facts are that Albert Blevins was the victim of a serious accident resulting in immediate, severe injury; those injuries were shown by objective evidence, including a number of X-ray pictures; plaintiffs' medical testimony showed the extent and permanency of those injuries; all of the foregoing was undisputed by any evidence offered by Cushman; and plaintiffs made a candid disclosure of the extent of Albert's recovery, the increase in his earning capacity as compared to what it was prior to the accident and the extent to which he can now drive 35,000 to 60,000 miles a year in the course of his work and even engages in some playing of golf. This state of the record overwhelmingly indicates the conclusion that Albert Blevins had in fact suffered the physical injuries and disabilities testified to by him, his wife and his physicians, Dr. Szabados and Dr. Snyder. In view of that, the trial judge found that the jury argument in question resulted in no prejudice to Cushman. No abuse of discretion appearing, an appellate court should not disturb that exercise of discretion. *Cook v. Cox*, 478 S.W.2d 678, 682 (Mo.1972).

## V

▮ For its next point, Cushman argues that the trial court erred in permitting the bailiff to give verbal instructions to the jury during their deliberations. The situation complained of came about as follows: At 2:12 p. m. the jury returned to open court. They returned two sheets of paper, one of which was signed by nine jurors who found "in favor of Albert L. and Linda Blevins, plaintiffs." The second sheet was signed by all twelve jurors who stated that they "find in favor of Albert L. and Linda

Blevins, plaintiffs. We assess Mr. Blevins' damages at $73,000.00 and assess Mrs. Blevins' damages at $21,000.00." These purported verdicts failed to comply with Instruction No. 9 which required a separate verdict for or against Albert L. Blevins and a separate verdict for or against Linda Blevins.

Upon receipt of these two sheets of paper the court conferred with counsel and then stated to the jury: "I must request of you, please, to return to your jury room, and using the precise form and language of Instruction No. 9, return your verdicts in accordance with those precise words and forms. If you would do that, please."

The jury then returned to the jury room under escort of the court bailiff. When the bailiff returned from this escort service, he reported to the judge in the presence of the lawyers, that the jurors had indicated some confusion about the form of verdict, to which the bailiff responded, "You'll just have to read the instructions." Some 20 minutes later, at 2:35 p. m., the jury again returned to open court, this time with two forms of verdict in precise compliance with Instruction No. 9. The first of these, signed by nine jurors, found for Albert L. Blevins and assessed damages of $73,000; the second, also signed by nine jurors, found for Linda Blevins and assessed her damages at $21,000.

Cushman objects as the gist of this point that the bailiff improperly gave supplemental verbal instructions to the jury. This approach does not fairly represent what happened. Rather than being a verbal "instruction," the bailiff gave little more than a civil response, repeating almost exactly what the judge had already told the jury in open court and in the presence of the lawyers. Certainly what the bailiff said constituted no misdirection. Nor can it be considered misconduct, especially since the bailiff promptly reported to the judge and to the lawyers just exactly what had occurred.

In any event, this matter could not have prejudiced Cushman. The jury had already reached a decision, evidenced by the original verdicts returned at 2:12 p. m. The

final verdicts were a mere correction in form and came back with precisely the same amount for each plaintiff which had been originally reported.

The cases cited by Cushman are distinguishable. A detailed discussion of them would unnecessarily extend an already lengthy opinion.

## VI

Cushman's next point complains of the admission into evidence of Exhibits 18 and 19, consisting of Cushman advertisements which had appeared in a golfing magazine. These advertisements read in part as follows:

> "Talk about a turned on ride. Smooooth. With a beefier, low-slung 3-point rubber suspension. New rubber suspension between power frame and main frame lets the GC tool through turns with super ease, super safety, super stability. Low ground-hugging center of gravity makes for wide stance, razor-honed handling. Fat, ground-gripping, turf-protecting 9.50 × 8 Terra Tires are standard. This baby floats the course."

Maxwell, Albert Blevins' fellow golfer, who had been driving the cart at the time of the accident, testified that he had seen and read Cushman advertisements similar to these exhibits. Cushman in its answer referred to Maxwell as "plaintiff's agent, servant, employee and joint venturer."

Cushman argues principally under this point its alleged distinction between a cause of action based upon warranty as opposed to a cause of action based upon strict liability in tort. It says that while the advertisements would have been admissible under the theory of warranty, they are not relevant to strict liability. This purported distinction has already been fully discussed under Point II of this opinion, which refuses to accept Cushman's position in this regard.

■ In any event, the advertisements represented by Exhibits 18 and 19 are plainly relevant under the strict liability submission. The instruction under this theory, MAI 25.04, requires the plaintiff to show

and the jury to find that the product in question was put to "a use reasonably anticipated." The advertisement in question not only made the type of use to which Albert Blevins and Maxwell put the cart "reasonably anticipated," but in addition that type of use was encouraged and "super safety" in doing so was specifically assured.

Moreover, Cushman had available, pleaded and attempted to prove, an affirmative defense of contributory fault. The assurances contained in the Cushman advertising were relevant as showing a justified use and reliance by the driver Maxwell and as tending to show that he was lulled by this advertising into a sense of security.

■ The contention by Cushman that these exhibits were inadmissible as hearsay has been considered and found without merit. These exhibits were identified and proved by Cushman's answers to interrogatories submitted by plaintiffs, and hence the exhibits are not within the hearsay preclusion.

## VII

Cushman next assigns as error the admission of portions of the deposition of Robert D. Von Seggern as admissions against interest. The principal basis for this objection is that the deponent had not been shown to be authorized to make admissions on behalf of Cushman.

When plaintiffs submitted interrogatories concerning the design, construction and performance of the Cushman golf cart, the answers came back to them signed by Von Seggern as the Cushman Chief Engineer. Plaintiff desired further information and explanations and therefore took Von Seggern's deposition. Statements appearing in that deposition, pertaining to the design, testing and performance of the carts, constituted the subject matter now in question.

■ The fact that Cushman itself designated Von Seggern as the one to answer questions in these respects fully answers the question of whether Von Seggern had that authority. His designation for the purpose of answering interrogatories made

his similar answers on deposition also within the scope of this authority.

Cushman attempts to distinguish the answers to interrogatories from the answers given on deposition by saying that the "factual matters" stated in answers to interrogatories "are a far cry from any admission of liability or intonation of liability." The vice of this attempted distinction is that the answers on deposition were just as much "factual matters" as were the answers to interrogatories.

■ Cushman also argues that plaintiffs' use of the term "admissions against interest" was prejudicial to it. In support, it points to the recognized distinction between admissions by a party and declarations against interest by a non-party. Cushman contends that by tacking on the words "against interest" to the concept of admissions, plaintiffs were taking an unfair and prejudicial advantage before the jury. The trouble with this argument is that a statement could not very well be an "admission" unless it were against interest. The term "admission" carries the connotation in everyday usage that it is contrary to the advantage of the one making the statement. Accordingly, the use of the additional phrase "against interest" could have created no prejudice in the minds of the jury which would not otherwise have been carried by the bare term "admission."

## VIII

Cushman's next point is that the trial court erred in not granting a new trial because the verdict was so excessive as to establish bias and prejudice by the jury. To put this point into perspective requires a description of the injuries to Albert Blevins.

When the cart upset and came down on Blevins, he was in distress as he lay under the cart with his feet mashed back over his head; he was unable to breath; he could inhale but he could not exhale. His condition was diagnosed as pneumothorax (collapse) of the left lung and his life was despaired of for several days during which he was kept under intensive care in the hospital.

He also received a twisting injury to the spine which resulted in compression fractures of the 11th and 12th dorsal vertebrae and the first lumbar vertebra and a dislocation of the costovertebral joints. He sustained fracture of the sternum which healed with a prominence or palpable ridge. Four of the fractured vertebrae fused together and they have become ossified. There was wedging of the various vertebrae with resulting angulation or dorsal prominence which has been a source of discomfort. Dr. Szabados testified that Blevins had made maximum recovery at the time of his examination and that conditions would grow worse with aging. Blevins was an inch shorter at the time of trial then he had been at the time of the accident. His life expectancy at the time of trial was 32.18 years.

Blevins testified that he could no longer play with his children or go on overnight Boy Scout trips with his son. He formerly did lawn and yard work and tied tomato vines but can no longer do so. If he leans over at an angle for more than a minute or two his back gets a numb sensation. He can no longer help his wife with housework. He has difficulty in sleeping. He cannot put on his shoes without a long shoe horn and cannot cut his toenails. He cannot attend church regularly because the wooden pews are uncomfortable to the dorsal prominence in his back.

His work requires considerable driving but this causes him distress and discomfort and sometimes he has to stop short on a trip and check into a motel. Although he is still able to play 4 or 5 rounds of golf a season, he has been unable to bowl since the accident. He can assume a normal position for sexual intercourse for only a very, very short period of time.

■ Cushman concedes that there are two different objections which can be made against a jury verdict. One is that it is merely excessive, and in that case the verdict may be cured by remittitur. The second type of objection is that the verdict is excessive as the product of bias and prej-

udice on the part of the jury; and in this case the excessiveness cannot be cured by remittitur, but requires a new trial. Cushman here makes only the second objection and pins its entire claim to relief under this point on the claim of bias and prejudice requiring the drastic relief of a new trial.

 It is firmly settled that " 'the mere size of a verdict—the fact that it may be excessive—does not in and of itself establish that it was the result of bias or passion and prejudice * * *, without showing some other error committed in the trial.' " *Cline v. Carthage Crushed Limestone Co.*, 504 S.W.2d 102, l. c. 116 (Mo.1973) and cases there cited. In order to show such "other error," Cushman relies upon the alleged erroneous closing argument pertaining to the right to call a physician, the bailiff's action in allegedly interfering with the jury's deliberations and the alleged punitive damage argument. These matters are discussed respectively under Points IV, V and X of this opinion and in each instance the claim of error is rejected. Accordingly, these claims cannot constitute "other error" for the purpose of satisfying the rule stated by *Cline*.

 The conclusion reached in the *Cline* opinion at 504 S.W.2d l. c. 117 is equally applicable in the present case:

"After considering the matter the trial court approved the amount of the verdict. Considering the broad discretion allowed the jury in fixing the amount of an award; the fact that the verdict had the approval of the trial judge, and considering all of the evidence on the question of damages in the light most favorable to the verdict, we cannot say that the amount awarded shocks the conscience of the court or conclude that the broad discretion granted the jury and trial court has been arbitrarily exercised and abused. Under the rulings in *Huffman v. Young*, 478 S.W.2d 332 (Mo.1972); *Long v. Hooker*, 443 S.W.2d 178 (Mo.1969), and related cases, the verdict of the jury under these circumstances is conclusive on appeal."

## IX

Cushman next assigns error in that the trial court failed to reprimand counsel with respect to a remark in the course of closing jury argument. The trial incident complained of appears in the record as follows:

"But now you will have some idea, Mrs. Smith and gentlemen, if you ever become a victim—

MR. SHERMAN: Now, if the Court please, this is objected to. This is highly improper and prejudicial, this type of argument, and prohibited by the Supreme Court rules.

THE COURT: The objection will be sustained.

MR. SHERMAN: I request that the jury be asked to disregard that remark and that counsel be admonished not to indulge in that type of remark again.

THE COURT: Yes. The jury will disregard the last remark."

It will be noted that the trial court sustained Cushman's objection to the incompleted remark made by plaintiffs' counsel and also ordered the jury to disregard that incompleted remark. All that is left for Cushman to complain of is the failure of the trial court to give the last item of relief asked by Cushman, namely that plaintiffs' counsel be admonished.

 The decision as to what action is appropriate to remedy errors made in closing argument lies very largely within the judgment of the trial court. As stated in *Wilkins v. Cash Register Service Co.*, 518 S.W.2d 736, l. c. 753 (Mo.App.1975), "the matter of reprimanding counsel is discretionary with the trial court." The failure to reprimand did not constitute an abuse of discretion which would warrant reversal of the judgment. The situation in *Faught v. Washam*, 329 S.W.2d 588 (Mo.1959), the sole case relied upon by Cushman, was wholly different from that here and *Faught* is not controlling.

## X

 Cushman next assigns as error that the trial court permitted plaintiffs' counsel to argue "if you want the corporate giant

**616**

to react, you take away a little of that profit and he'll notice that. He'll make some changes when you begin to do that." Cushman contends that remark did not pertain to any proper element in the case and was an effort to argue punitive damages. Fatal to this contention is the fact that Cushman made no objection at the time of the argument of which complaint is now made. The objection was therefore waived.

Cushman asks that this claim of error be reviewed as "plain error" under Rule 79.04 (now Rule 84.13[c]). The argument in question did not produce any manifest injustice or miscarriage of justice within the requirement of that exception. *Sandy Ford Ranch, Inc. v. Dill*, 449 S.W.2d 1 (Mo.1970); *Stevens v. Wetterau Foods, Inc.*, 501 S.W.2d 494 (Mo.App.1973); *Kallenbach v. Varner*, 502 S.W.2d 446 (Mo.App. 1973).

### XI

Finally, Cushman urges that the trial court erred in not granting a new trial because of the cumulative effect of the matters heretofore discussed. Each of the other ten specific assignments of error have already been individually considered and ruled adversely to Cushman. Those assignments have no greater effect collectively.

Cushman says that the opinion in *Faught v. Washam*, supra, controls. The factual situation in *Faught* was so utterly different that the ruling there has no application here.

The judgment is affirmed.

SEILER, C. J., MORGAN, BARDGETT, HENLEY and FINCH, JJ., and FLANIGAN, Special Judge, concur.

RENDLEN, J., not sitting.