Larry Joe LEWIS, Plaintiff-Respondent,

v.

ENVIROTECH CORP., Hugh Burton, and Robert W. Haase, Defendants-Appellants.

Nos. 47088, 47128.

Missouri Court of Appeals, Eastern District, Division Two.

May 22, 1984.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 9, 1984.

Application to Transfer Denied Sept. 11, 1984.

**106**

William Davis, Peter Spataro, Dana Eilers, St. Louis, for defendants-appellants.

John Musgrave, Paul Brown, Martha Rudolph, St. Louis, for plaintiff-respondent.

PUDLOWSKI, Judge.

Respondent and cross-appellant Larry Joe Lewis (hereinafter referred to as "plaintiff") brought this action for injuries sustained when his right hand became caught in the belts and pulleys of a pump on which he was working. Plaintiff's suit alleged the machinery began turning due to the failure of a defective check valve manufactured and sold by appellant and cross-respondent, Envirotech Corporation (hereinafter "defendant"), and distributed by appellants and cross-respondents Hugh Burton and Robert Haase, who at the time were doing business as Midwestern Engineered Equipment (hereinafter also "defendants"). A jury returned a verdict in favor of plaintiff and against all defendants for $850,000. The trial court entered an order overruling plaintiff's motion for new trial on the issue of punitive damages; overruling defendants' motion for judgment notwithstanding the verdict and motion for new trial on liability; and granting defendants' motion for new trial on the issue of compensatory damages unless plaintiff agreed to remit $715,000 on or before March 28, 1983. Plaintiff did not accept the remittitur. We affirm.

Plaintiff was injured October 17, 1979 while working as a maintenance mechanic at the Associated Electric Cooperative, Inc., power plant in Marston, Missouri. Lewis and another mechanic were assigned to work on a pump in the Ash Dewatering Facility, which was built in the spring of 1978 to separate bottom ash produced from burning coal in the power plant into various sizes of "grit" for sale to sand blasting and manufacturing companies.

The ash or slag produced by burning coal in the power plant is dropped into water where it crystallizes. The slurry mixture is sluiced out to the Ash Dewatering Facility, which is located away from the main power plant building. The slurry is filtered through screens to separate out the various sizes of slag for commercial use. The remaining slurry is known as waste water and contains only very fine particles of slag. The waste water is pumped into a pit located outside of a small building known as the pump house.

In the pump house, three pumps send waste water from the pit into an overhead

pipe known as the discharge header, which runs out of the pump house several hundred yards to large holding basins known as slag ponds. These three pumps sit in a straight line running north and south and are labeled A, B and C. On the day of plaintiff's accident, only B pump and C pump were on line.

Located above the pumps, between each pump and the discharge header, is a Flex Check Valve. The valves were manufactured by defendant Envirotech Corporation, Inc., through an order received and processed by defendants Burton and Haase. A Flex Check Valve is a flapper-type valve that opens when water flows in one direction and closes when water flows in the opposite direction. In the Ash Dewatering Facility, these valves were to permit water to flow upward from the pumps into the overhead discharge header and were to close against reverse flow to prevent waste water from flowing from the discharge header into the pumps when the pumps were turned off. The valves were lined with replaceable rubber liners to prevent corrosion in the cast iron body parts of the valves.

On the day of plaintiff's accident, he and another mechanic were assigned to check the belts on B pump in the pump house because the belts were squealing. When they arrived at the pump house, plaintiff sprayed the belts with belt dressing, but they began squealing again within a few minutes. Plaintiff called the control room over an intercom and asked that B pump be shut down.

After an operator shut off B pump, plaintiff looked through the belt guard at the pulleys connected to B pump and saw they had stopped. He then walked over to the side of the pump, bent over and stuck his right hand in behind the belt guard to touch the belts to check the tension. When plaintiff touched the belts, his right hand was jerked by the belts through the top pulleys, which were spinning in the reverse direction. Plaintiff's right arm was pulled in between the belt guard and the motor and became wedged.

Plaintiff's co-workers attempted to free his hand from the machinery by prying on the belt guard with a broom handle, but they stopped after plaintiff said, "It's not working. It's eating my hand up." Finally, by loosening the bolts on the guard, plaintiff's co-workers were able to pull him free of the spinning machinery.

Plaintiff's index finger was nearly severed and was hanging by a piece of skin when he finally was released from the machinery. The skin had been rubbed off of his right long finger and ring finger and his wrist was fractured. He had sustained severe tearing and rupturing of the tendons, muscles and other soft tissues of his fingers and right forearm. A co-worker administered first aid, bandaged plaintiff's hand and applied an ice bag to keep the pain down while they waited for an ambulance to take plaintiff to a Sikeston hospital 25 miles away.

Doctors at Delta Community Hospital in Sikeston examined plaintiff and then sent him by ambulance to Barnes Hospital in St. Louis. Plaintiff arrived at Barnes nearly six hours after the accident. At Barnes, Dr. Barbel Holtman, a plastic surgeon, amputated plaintiff's index finger, repaired a tendon of the ring finger by reinserting it into the bone and repaired the multiple skin lacerations on the fingers and hands. Dr. Holtman also repaired ruptures in the tendons of plaintiff's forearm.

Dr. Holtman operated again on plaintiff October 22 and amputated a remaining segment of his index finger. Dr. Holtman also took a skin graft from plaintiff's right thigh and applied it to the forearm wound.

Plaintiff was discharged from Barnes November 2, 1979 after spending 17 days in the hospital. Plaintiff then received physical therapy at Barnes Hospital and Delta Community Hospital for six months after his discharge from the hospital. Plaintiff made eight visits to Dr. Holtman in the eighteen months after his accident. Dr. Holtman testified she did not expect plaintiff to recover any additional function of his right arm and hand.

Dr. Jerome F. Levy examined plaintiff April 30, 1981 to evaluate his physical condition. Dr. Levy testified plaintiff would not be able to recover any of the loss of movement in his wrist and fingers. Dr. Levy concluded plaintiff had sustained a permanent, partial loss of 70 percent of the use of his right arm from the elbow down as a result of his injuries.

Plaintiff testified at trial he has less than normal strength in his injured hand, has no grip and cannot make a fist. His hand remains very sensitive to heat and cold. Plaintiff's medical expenses totalled $7,700.

Lewis missed 120 days of work because of the accident. He also missed between 160 and 200 hours of mandatory overtime work, which would have been compensated at a rate one and-one-half times his pay rate of $9.80 per hour. Plaintiff has a high school diploma and has worked all of his life at jobs requiring manual dexterity. At the time of trial, he still was working for Associated Electric Cooperative, Inc., and had been promoted to a supervisory position with the company.

The day after plaintiff was injured, three mechanics were assigned to work on the pump at the Associated Electric Cooperative, Inc., plant. They took B pump apart and found it full of slag. They also found a piece of rubber wrapped around the impeller, which they later determined to be part of the rubber liner from the Flex Check Valve located above B pump. They took the Flex Check Valve apart and found the flapper disk torn away from its hinges and wedged inside of the check valve. They also found slurry behind the rubber liner of the valve, which produced bulges inside the check valve and prevented the flapper from closing.

Donald Gibson, an associate professor of engineering at the University of Missouri-Columbia, made an investigation of the Ash Dewatering Facility. He testified at trial that in his opinion, plaintiff's injury was caused by a failure of the Flex Check Valve above B pump to close against back pressure when B pump was shut off. He said the failure permitted slurry to flow from the discharge header back through the check valve and into the pump, causing the belts and pulleys to spin backwards when they should have been out of operation.

Gibson testified the valve failed because the gasket at the outlet flange of the check valve was inadequate in design and permitted slurry to leak behind the valve's liner of the check valve and settle into pockets behind the liner near the flapper, producing bulges in the liner. The bulges interfered with the movement of the flapper and prevented it from closing against back pressure as intended. Gibson testified that in his opinion the Flex Check Valve is inadequately designed.

The Ash Dewatering System was designed by Burns & McDonnell Engineering Company. Michael McComas, the engineer who designed the Ash Dewatering System and selected the component parts, testified he choose the Flex Check Valve for use in the system based in part on representations in an advertising brochure published and distributed by Envirotech.

Donald Ashe, president of Envirotech's Allen-Sherman-Hoff Division, testified Envirotech never had tested Flex Check Valves under simulated operating conditions at a hydraulic testing facility. Ashe testified the company relies on field tests of its product. He said the company's field service representatives are responsible to customers for service and installation. The company uses field service reports to learn of specific problems experienced by its customers. The Flex Check Valve also passes several factory tests and specifications before being sold, according to testimony by defendants' witnesses.

After hearing the evidence at trial, the jury returned a verdict for plaintiff, assessing damages at $850,000. This appeal follows. Defendants appeal the trial court's order overruling their motion for judgment n.o.v. and motion for new trial on the issue of liability. Plaintiff cross-appeals from the trial court's order granting defendants a new trial on the issue of compensatory damages and denying plaintiff's motion for

a new trial on the issue of punitive damages.

On appeal, defendants raise eight points of error. Defendants' first three points can be consolidated into one issue: whether the evidence was sufficient to submit defendants' liability under the doctrine of strict liability. Point four alleges trial court error in submitting both MAI 25.04, relating to Strict Liability-Product Defect, and MAI 25.05, relating to Strict Liability-Failure to Warn, in that the instructions are inconsistent and conflicting. Points five and six allege error in the refusal to allow defendants to cross-examine plaintiff on the issue of contributory fault and in refusing to submit an affirmative defense of contributory fault instruction to the jury. Point seven alleges error in overruling defendants' objection pertaining to cross-examination of defendants' witness, Harold Basmadjian. Point eight alleges an excessive verdict.

 In connection with defendants' principal point that plaintiff failed to make a submissible case, a few preliminary observations are appropriate. The cause was tried and submitted on the theory enunciated by our Supreme Court in *Keener v. Dayton Electric Manufacturing Company*, 445 S.W.2d 362, 364 (Mo.1969). The court recognized the concept of strict liability in tort as stated in Restatement (Second) of Torts § 402A (1977). To recover under the doctrine of strict liability, a plaintiff must establish 1) the product was defective and dangerous when put to a use reasonably anticipated by the manufacturer and 2) the plaintiff sustained injury or damage as a direct result of the defect. *Blevins v. Cushman Motors*, 551 S.W.2d 602, 607 (Mo. banc 1977). A plaintiff has the burden to show the defect existed when the product left the manufacturer's control and entered the stream of commerce. *Brissette v. Milner Chevrolet Company*, 479 S.W.2d 176, 181 (Mo.App.1972).

Defendants contend the evidence submitted to the jury on the defective condition of the Flex Check Valve was insufficient as a matter of law to support a verdict or judgment for plaintiff. Defendants claim the Ash Dewatering Facility incorporating the Flex Check Valve had been altered substantially.

Defendants' evidence on the alterations included testimony by the Burns & McDonnell engineer who had designed the Ash Dewatering Facility. The engineer testified he had designed two isolation valves for each pump on the system, including on B pump where plaintiff was injured. The engineer testified the purpose of the valves was to cut off the flow into the pump to isolate the pump for maintenance.

An engineer at Associated Electric removed the isolation valves from the pipelines. Defendants argue if the isolation valves had not been removed, B pump would have been isolated during the maintenance performed by plaintiff. They argue the isolation would have prevented the rush of slurry that caused the pulley belts on the pump to move, injuring plaintiff's right upper limb.

Defendants also contend the pumping system was altered substantially by the removal of two vacuum breaker valves that were designed and located on top of the common discharge header line in the pump room. Defendants' expert testified these valves were crucial for the system to avoid vacuum conditions. Defendants' witnesses testified that after the vacuum breaker valves were removed, a powerful vacuum sucked in the rubber liners of the Flex Check Valves.

Defendants argue the alterations in the system were not reasonably foreseeable and rendered the Flex Check Valve unforeseeably unsafe. Defendants claim these alterations were the superseding cause of plaintiff's injury.

 Defendants are asking us to accept their evidence and their version of how the accident occurred in ruling on the submissibility of plaintiff's case. This we cannot do. We must consider the evidence in the light most favorable to the plaintiff, with all reasonable inferences to be drawn therefrom, and disregard the defendants'

evidence unless it aids the plaintiff's case. *Winters v. Sears, Roebuck and Co.,* 554 S.W.2d 565, 569–570 (Mo.App.1977).

█ Plaintiff presented testimony by the engineer for Burns & McDonnell who was present at the site during construction of the Ash Dewatering Facility. He testified the Flex Check Valves were installed in the system as received from the manufacturer. The plant engineer for Associated Electric testified the Flex Check Valves had not been replaced or modified before plaintiff's accident. This testimony was sufficient to submit to the jury the question of whether the Flex Check Valve reached the user in substantially the same condition as when it was sold by the defendants. *See Winters v. Sears,* 554 S.W.2d at 571–573 and *Williams v. Deere and Company,* 598 S.W.2d 609, 612–613 (Mo.App.1980).

Defendants cite *Hales v. Green Colonial, Inc.,* 490 F.2d 1015, 1020–21 (8th Cir. 1974) for the proposition the doctrine of substantial alteration exonerates defendants in certain products liability cases. Defendants' reliance on *Hales* and other similar cases is misplaced. These cases involve products that allegedly had been altered. We have not found and defendants have not cited us to case law supporting their proposition that alterations to other components of a system of which the product in question is a component bars liability for a defect in the product itself.

Alterations to the system may be significant, however, the crucial issue is whether plaintiff made a submissible case by establishing that the Flex Check Valve was used in a manner reasonably anticipated. In reviewing plaintiff's evidence on this point, we find plaintiff made a submissible case. Plaintiff introduced admissions by Envirotech that it manufactures and sells Flex Check Valves for use in slurry pumping systems and that it advertises Flex Check Valves are suitable for such use. The evidence showed the Ash Dewatering Facility in which the Flex Check Valve was installed was a slurry pumping system.

Plaintiff introduced evidence refuting defendants' contention the Flex Check Valve should not have been used except in conjunction with an isolation valve. The evidence showed Envirotech had advertised the valve would "snap back bottle tight against back pressure" and had provided no instructions or warnings to customers regarding the use of Flex Check Valves. None of the advertising brochures or other promotional materials used by Envirotech in marketing the valves made any mention Flex Check Valves should be used only with isolation valves. Tom Moore, plant engineer for Associated Electric, testified he was not aware of any principle of engineering that requires check valves to be used only in conjunction with isolation valves. Plaintiff's evidence was sufficient to submit to the jury the question of whether the Flex Check Valve was used in a reasonably anticipated manner.

In compliance with *Blevins,* plaintiff submitted evidence that he was injured as a direct result of the defective condition of the Flex Check Valve. Gibson, the engineering professor, testified plaintiff's injuries were caused by a failure of the Flex Check Valve above the pump to close against back pressure when the pump was shut off. Gibson testified the valve failed to close against back pressure because of an inadequate design of the gasket at the outlet flange of the valve. The valve could leak at normal operating pressures because of this inadequate design and permit slurry to get behind the rubber liner of the valve, he said. Gibson's testimony as to the cause of plaintiff's injuries made a submissible case plaintiff was injured as a result of the defective condition of the Flex Check Valve and left for the jury to consider defendants' contentions that plaintiff's injuries were produced by some other cause.

█ The jury was the sole judge of the credibility of the witnesses and the weight and value to be given their testimony and could believe or disbelieve any part of that testimony. *Coulter v. Michelin Tire Corp.,* 622 S.W.2d 421, 432 (Mo.App.1981). The jury considered and rejected defendants' version of the facts. We find there was evidence from which the jury reason-

ably could conclude the Flex Check Valve was defective and dangerous when put to a use reasonably anticipated by the manufacturer and the plaintiff sustained injury as a direct result of the defect.

■ On the issue of conflicting jury instructions, the trial court read and gave to the jury both the verdict directing instructions relating to the defective design of the Flex Check Valve, MAI 25.04, and MAI 25.05, relating to defendants' failure to warn. Under appropriate cases, it is not error to use both MAI 25.04 and 25.05. *Tennis v. General Motors Corp.*, 625 S.W.2d 218 (Mo.App.1981). In such cases, the alternative submissions must not be inconsistent with one another and there must be evidence to support each theory. *Carsel v. Mitchell*, 261 S.W.2d 249 (Mo. App.1953).

■ The dangerous condition submitted by plaintiff's evidence is that slurry can leak behind the liner of the Flex Check Valve and prevent the valve from closing against back pressure. Under MAI 25.04 the jury could have found that the Flex Check Valve was defectively designed because the outlet gasket was insufficient to withstand leakage. Under MAI 25.05, the jury could have found that defendants failed to give an adequate warning of this condition. Neither of these two theories requires proof of a state of fact that would necessarily disprove a state of fact necessary to support the other. The evidence presented at trial was sufficient to support the giving of both instructions. Nor was there an inconsistency between the theories presented.

■ Defendants next allege trial court error in the failure to allow defendants to cross-examine plaintiff and other witnesses on the affirmative defense of contributory fault and to submit jury instructions to that effect. Contributory negligence is not a defense to an action brought in strict liability in tort. *Keener v. Dayton Electric Manufacturing Company*, 445 S.W.2d 362 (Mo.1969). However, contributory fault is a complete defense in a products liability

suit brought in strict liability "if the user discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it." *Keener* at 365.

■ Had they been allowed to proceed, defendants contend they would have shown it was proper to remove the guard and it was also proper to use a tool or tension meter to test belt tension rather than to put one's hand on the belts. While defendants' contention may be correct, it misses the point. Defendants are arguing "contributory negligence" not "contributory fault." There was no evidence plaintiff was aware of the defect in the Flex Check Valve or of the danger created thereby. As a result, plaintiff is not barred from recovery under a theory of "contributory fault." The trial court did not err in excluding the cross-examination testimony and denying defendants' proffered instructions.

■ In point seven, defendants contend the trial court erred in permitting plaintiff's counsel to cross-examine one of defendants' witnesses regarding what evidence Envirotech had to back up its claim Flex Check Valves had been used in thousands of installations around the world without failures of the kind that caused plaintiff's injury. In the instant case, defendants introduced testimony that Flex Check Valves have been used in thousands of installations without failures in order to bolster their contentions that Flex Check Valves are not defectively designed. Either party is entitled to introduce evidence to rebut that of his adversary. It was proper for plaintiff to inquire on cross-examination of defendants' witnesses the existence of documentation to back up this claim. The scope of cross-examination is discretionary with the trial judge and his ruling will not be disturbed except for an abuse of discretion. *Parker v. Pine*, 617 S.W.2d 536 (Mo.App.1981).

In their final point, defendants contend the verdict was excessive and was motivated by bias, prejudice, sympathy and misconduct on the part of the jury. This point

will be discussed in plaintiff's points on cross-appeal.

We turn now to plaintiff's points on cross-appeal. Plaintiff claims the trial court abused its discretion in ordering a new trial on the issue of compensatory damages unless plaintiff would agree to remit $715,000 from the jury's award of $850,000.

■ The trial court may order a remittitur when a jury awards excessive damages. The purpose of the remittitur is to prevent injustice when a jury has made an honest mistake in weighing the evidence as to the nature and extent of the injury and has awarded disproportionate damages. *Koehler v. Burlington Northern, Inc.*, 573 S.W.2d 938, 945 (Mo.App.1978).

■ The trial judge is afforded broad discretion in ordering a remittitur. The discretion is afforded because the order of remittitur by the trial court constitutes a ruling upon the weight of the evidence. *Ricketts v. Kansas City Stock Yards of Maine*, 537 S.W.2d 613, 621 (Mo. App.1976). We will disturb an order of remittitur only upon a finding of an arbitrary abuse of discretion by the trial judge. We do not find such an abuse of discretion in the present case. The trial judge, after weighing the evidence, held the amount of the verdict was excessive. The award by the jury was double the amount requested by plaintiff's attorney during his closing argument. The trial court ordered a new trial on the issue of compensatory damages unless the plaintiff agreed to the remittitur. We affirm the trial court's order. Plaintiff declined to accept the remittitur and, therefore, the trial court should proceed with a new trial only on the issue of compensatory damages.

We now address plaintiff's claim the trial court erred in refusing to instruct the jury on the issue of punitive damages as against defendant Envirotech.

■ In Missouri, punitive damages are awarded for the purpose of punishing a wrongdoer and as an example and deterrent to others engaging in similar conduct.

*Northern v. McGraw-Edison Company*, 542 F.2d 1336, 1349 (8th Cir.1976). Punitive damages may be recovered in strict liability actions in Missouri when the defendant's conduct shows complete indifference to or conscious disregard for the safety of others. *Racer v. Utterman*, 629 S.W.2d 387, 396 (Mo.App.1981).

■ Plaintiff argues there was sufficient evidence to submit to the jury the question of whether Envirotech's sale of the Flex Check Valve showed complete indifference to or conscious disregard for the safety of others. Plaintiff specifically points to evidence Envirotech did not test the Flex Check Valve in a slurry pumping system before putting the valve on the market. Plaintiff argues a punitive damages instruction was justified by evidence Envirotech represented in advertising brochures the valves were proven effective in slurry pumping systems.

The trial court refused the following instruction sought to be introduced by plaintiff as Instruction A:

If you find in favor of plaintiff Larry Joe Lewis under Instruction Number ————, ————, or ———— and if you believe:

First, defendant Envirotech Corporation manufactured the Flex Check valve, and

Second, defendant Envirotech Corporation advertised the Flex Check valve as being suitable for use in slurry pumping systems, and

Third, at the time defendant Envirotech Corporation made the representation submitted in Paragraph Second, defendant Envirotech Corporation had never tested Flex Check valves, nor was it aware of any such testing having ever been done, to determine the suitability of Flex Check valves for use in slurry pumping systems, and

Fourth, defendant Envirotech Corporation thereby showed complete indifference to or conscious disregard for the safety of others,

then in addition to any damages to which you may find plaintiff Larry Joe Lewis entitled under Instruction Number _____ you may award plaintiff Larry Joe Lewis an additional amount as punitive damages in such sum as you believe will serve to punish defendant Envirotech Corporation and to deter defendant Envirotech Corporation and others from like conduct.

The instruction was a modification of MAI 10.04 (effective Jan. 1, 1983). Under MAI 10.04, punitive damages may be awarded in a products liability action if the jury finds the defendant knew of the defect in the product and of the danger posed thereby at the time it sold the product, and further finds the defendant's conduct showed complete indifference to or conscious disregard for the safety of others. The Committee's Comment to MAI 10.04 states the instruction was drafted to submit the issue of punitive damages under the evidence detailed in *Racer v. Utterman,* but if the substantive law and the evidence support a submission on a theory other than actual knowledge of the product defect, the instruction should be modified accordingly.

Plaintiff argues the substantive law of punitive damages and the evidence adduced at trial warranted a modification of MAI 10.04 to submit the issue of punitive damages to the jury on a "failure to test" theory. Plaintiff contends even when there is no evidence a defendant knew of a product defect, the failure to test a potentially dangerous product constitutes conscious disregard for the safety of others.

There is no case law in Missouri to support plaintiff's "failure to test" theory. Furthermore, the facts do not warrant the theory's adoption in this case. The evidence supporting awards of punitive damages in the cases cited by plaintiff is wholly lacking in the present case. In *Campus Sweater and Sportswear Company v. M.B. Kahn Construction Company,* 515 F.Supp. 64 (D.S.C.1979), there was evidence the defendant company engaged in fraudulent misconduct, failed to test its product adequately and failed to warn consumers of product defects. There was also evidence the defendant knew its product was defective, but continued sales due to the product's profitability. *Id.* at 104. In *Leichtamer v. American Motors Corp.,* 67 Ohio St.2d 456, 424 N.E.2d 568 (1981), the defendant company advertised its jeep as an off the road vehicle with a "reinforced steel roll bar for added protection." *Id.* 424 N.E.2d at 580. Two persons were killed and two others severely injured after the jeep overturned and the roll bar collapsed while they were driving on a trail. The court found the company's advertising campaign and its failure to test the roll bar despite the foreseeability of roll-over accidents justified an award of punitive damages. *Id.*

We do not regard Envirotech's actions in selling the Flex Check Valve as comparable to the facts in *Campus Sweater* and *Leichtamer.* There is no evidence Envirotech knew its product was defective or that the company consciously disregarded anyone's safety. The evidence showed Envirotech relied on field tests and field service reports. The fact the company conducted field tests rather than the simulated tests plaintiff claims it should have conducted does not rise to the necessary level of disregard for the safety of others. We view the company's advertising statements as justified based on the product's success in field tests. The trial court correctly refused to instruct the jury on the issue of punitive damages as against Envirotech.

In conclusion, we affirm the overruling of plaintiff's motion for a new trial on the issue of punitive damages; affirm the overruling of defendants' motion for judgment n.o.v. and motion for new trial on the issue of liability; and affirm the granting of defendants' motion for new trial on the issue of compensatory damages.

Affirmed.

CRIST, P.J., and SIMON, J., concur.